2004 WY 145

Craig ABRAHAM and Kim Abraham, husband and wife, individually, and on behalf of their minor children, Ethan Abraham, Jessica Abraham, Sheldon Abraham, and Branden Abraham; and Gary A. Barney, as Bankruptcy Trustee for Craig Abraham and Kim Abraham, Appellants (Plaintiffs),

v.

GREAT WESTERN ENERGY, LLC, a Montana corporation, d/b/a Wyo. L.P. Gas; and Big Horn Co–Operative Marketing Association, a Wyoming corporation, Appellees (Defendants).

No. 03–226.

Supreme Court of Wyoming.

Nov. 24, 2004.

Representing Appellants: William L. Simpson of Simpson, Kepler & Edwards, LLC, Cody, Wyoming, and Diane Vaksdal Smith of Burg, Simpson, Eldredge, Hersh and Jardine, P.C., Cody, Wyoming. Argument by Ms. Smith.

Representing Appellees: John V. McCoy and Thomas C. Hofbauer of McCoy & Hofbauer, Waukesha, Wisconsin, and Bradley D. Bonner of Bonner & Stinson, P.C., Powell, Wyoming, for appellee Great Western Energy, LLC; Scott McColloch of McColloch & Burns, Greybull, Wyoming, and Thomas W. Pahl, David M. Dahlmeier, and Jessica B. Rivas of Foley & Mansfield, PLLP, Minneapolis, Minnesota, for appellee Big Horn Co-Operative Marketing Association. Argument by Messers. Dahlmeier and McCoy.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶1] Craig Abraham was severely burned and permanently injured in a propane gas

flash fire [1] at his home in Otto, Wyoming, on July 29, 2000. On November 29, 2001, a complaint was filed in the district court naming Craig, as well as his wife Kim Abraham and their four children, as plaintiffs (collectively the Abrahams).[2] In their complaint, the Abrahams asserted that they ran out of propane gas (which was used to run two hot water heaters and a furnace) in late July of 2000. Kim Abraham called Great Western Energy, LLC (GWE)[3] and asked it to deliver 50 gallons of propane. Craig was unable to get the hot water heater to light after that delivery was made, and so he ordered a second delivery of propane from Big Horn Co–Operative Marketing Association (Big Horn). He called Big Horn for the second delivery because it was the only supplier open on Saturday. Following the second delivery, Craig made a second attempt to light the hot water heaters and that effort eventuated in the flash fire.

[¶ 2] The Abrahams averred that GWE and Big Horn were negligent because they "failed to provide adequately odorized gas, preventing Craig Abraham from being alerted to the presence of propane when he was attempting to light the pilot light. Furthermore, [both GWE and Big Horn] failed to follow proper off-loading procedures, violated industry safety standards, and failed to perform the necessary inspections to ascertain whether the gas system was safe...." In addition, they claimed that because of the inherently dangerous nature of propane gas, GWE and Big Horn owed a duty to ensure that their product was safely delivered and used in a safe manner. The Abrahams' complaint included claims for negligence, strict liability (defective product), and willful and wanton misconduct. Big Horn answered the complaint on February 28, 2002, denying any negligence on its part and raising numerous affirmative defenses, including spoliation (destruction) of evidence. GWE answered on

August 1, 2002, denying any negligence on its part and also raising numerous defenses, including spoliation of evidence ("certain evidence may have been tampered with, destroyed, lost and/or undergone destructive testing to [its] prejudice.").

[¶ 3] On June 4, 2003, Big Horn filed a motion for summary judgment that ran to almost 400 pages. The central issue in that motion was that it was entitled to summary judgment because of spoliation of evidence. On June 30, 2003, GWE filed a very similar motion for summary judgment centered on the spoliation of evidence issue.

[¶ 4] The Abrahams opposed both motions by papers filed on June 25, 2003, and July 16, 2003, respectively. In the later document, the Abrahams asked for a continuance and asserted that the deadline for discovery was August 15, 2003, but that the hearing on the motions for summary judgment was scheduled for July 28, 2003. The Abrahams contended this additional time was important in order to respond to the affidavit of an expert witness submitted by Big Horn.

[¶ 5] A decision letter granting the motions for summary judgment was filed of record on August 5, 2003, and an order memorializing the decision letter was entered on September 3, 2003. The effect of the summary judgment order was that the Abrahams' complaint was dismissed with prejudice. It is from that order that this appeal is taken, as well as the district court's denial of the Abrahams' motion for continuance, which was incorporated into the summary judgment order.

## ISSUES

[¶ 6] The Abrahams articulate these issues:

1. Whether denial of [the Abrahams'] Rule 56(f) motion for a continuance to substantively respond to pending motions for

---

1. Although the incident is most often referred to as an "explosion" in the record and the briefs, it seems clear that what occurred in this case was a "flash fire." Joseph Schneider and Edward M. Swartz, *Liquefied Petroleum (LP) Gas Fires and Explosions,* 14 Am.Jur. Trials 343, § 2 (definitions and terminology) (1968 and Supp.2001).

2. By order entered by this Court on March 2, 2004, Gary A. Barney was substituted for the Abrahams as Bankruptcy Trustee for Craig and Kim Abraham. However, for convenience and clarity we will continue to refer to the Abrahams and the Bankruptcy Trustee as "the Abrahams."

3. GWE was known locally as Wyo LP Gas.

summary judgment constitutes an abuse of discretion and reversible error?

2. Whether the trial court should have denied the motions for summary judgment because material facts remained in dispute concerning [the Abraham's] causes of action as well as the allegations of spoliation of evidence?

3. Whether dismissal of [the Abrahams'] entire case, without proof of intentional spoliation and without consideration of the Abrahams' claims unrelated to the alleged spoliated evidence, is reversible error?

Big Horn responds with this statement of the issues:

I. Dismissal of all claims is appropriate where a litigant, intentionally or negligently, disposes of crucial evidence involved in an accident before the adversary has an opportunity to inspect the accident scene. Here, before [Big Horn] was notified of the propane fire, unidentified persons entered the Abrahams' residence with [their] knowledge and destroyed critical physical evidence from the flash fire. Did the district court err in granting [Big Horn's] summary judgment motion in light of the complete destruction or alteration of the physical evidence that precluded [the Abrahams] from proving their allegations against [Big Horn]?

II. Wyoming law recognizes that "the whole purpose of the procedural technique of a summary judgment would be defeated if cases could be forced to trial by the mere assertion that a genuine issue of material fact exists." Here, [the Abrahams] failed to argue below that there were material facts that defeated summary judgment and no amount of additional discovery will change the undisputed facts which the district court relied upon in dismissing [the Abrahams'] claims. Did the district court err in Granting [Big Horn's] summary judgment motion where [the Abrahams] failed to point to evidence raising disputed issues of material fact and where the undisputed facts in the record demonstrated that loss of physical evidence from the fire prevented [them] from proving their claims against [Big Horn]?

III. A district court has the discretion to order a continuance only where a party demonstrates that more time is needed for discovery in order for that party to respond to a summary judgment motion. Here, [the Abrahams] sought a continuance to respond to [GWE's] motion for summary judgment less than two weeks before the oral argument, claiming they needed more time for discovery after a two-year opportunity to conduct discovery. No such similar request for a continuance was made as to [Big Horn]. Did the district court here abuse its discretion by denying [the Abrahams'] motion for a continuance where [they] had two years to conduct discovery and where no amount of additional discovery was going to change the undisputed facts in the record?

GWE presents this statement of the issues:

1. Whether [the Abrahams] lack standing to pursue this appeal;

2. Whether the district court properly granted summary judgment because there were no remaining issues of material fact and [GWE was] entitled to judgment as a matter of law;

3. Whether the district court properly dismissed [the Abrahams'] case because, due to permanent alteration of the evidence, [their] case rests only on speculation and [GWE] is irreparably prejudiced;

4. Whether the district court acted within its discretion when it denied [the Abrahams'] Rule 56(f) motion for a continuance because adequate time was afforded and any further discovery would have been fruitless; and

5. Whether [the Abrahams] are judicially estopped from pursuing this appeal.

In their reply brief, the Abrahams contend GWE and Big Horn raised several new issues that they articulate as follows:

A. [GWE] argues that the [Abrahams] lack standing to pursue this appeal.

B. [GWE] argues that [the Abrahams] are judicially estopped from bringing this appeal.

C. [GWE] argues that the trial court did not dismiss the Abrahams' claims as a sanction for spoliation of the evidence.

D. [GWE and Big Horn] argue that Wyoming law recognizes spoliation of evidence and would permit the sanction of dismissal, based on authorities not from Wyoming.

· E. [GWE and Big Horn] argue that the Abrahams failed to timely pursue discovery, and the denial of the Rule 56(f) motion for continuance was proper because further discovery would have been futile.

## FACTS AND PROCEEDINGS

[¶ 7] Since this case was disposed of pursuant to GWE's and Big Horn's motions for summary judgment, the applicable standard of review requires this Court to view the evidence in a light most favorable to the Abrahams, to disregard the evidence favorable to GWE and Big Horn, and to embrace any and all inferences to be drawn from the evidence in favor of the Abrahams. Therefore, we will confine our recitation of the facts to that standard. The Abrahams moved into the residence where the flash fire occurred in late May of 2000.[4] At the time they moved into the five-bedroom house, the pilot for the furnace was not lit because it was summer, but the landlord lit the pilots for the water heaters. It was the Abrahams' responsibility to provide propane for their use. On Friday, July 28, 2000, Kim Abraham discovered that there was no hot water for the residence. After moving into the house, the Abrahams had not taken steps to get on a regular delivery route for propane. Kim checked the gauge on the propane tank and found it was empty. She contacted her husband who was in Laramie and, because money was tight, ordered a delivery of only 50 gallons (for a 1,000 gallon tank) from GWE.

[¶ 8] Craig Abraham returned to Otto during the night of July 28–29, 2000. The next morning he tried to light the water heaters. He had prior experience lighting pilot flames and had worked around propane as a farmer, but had not "bled" propane gas lines before. After many attempts, he could not get either pilot lit and gave up in disgust.

[¶ 9] He called Big Horn to get a second delivery of another 50 gallons of propane and then left home to go to his office for a couple of hours. The second order for gas was delivered in his absence. Kim was home when the gas was delivered, and the delivery man told Kim they would need to "bleed" the gas lines in order to get the water heaters to light. Kim related that neither delivery man offered to light the pilot flames.[5] Craig had hoped the delivery man would have lit the pilots, but since he had not, Craig began a second attempt to light them. Craig checked the tank and could tell that additional propane had been added to the tank. He then began the process of bleeding the gas lines and lighting the pilots and, in the course of that process, completely disconnected the gas lines from the water heaters in order to "bleed" them and get propane flowing to the system. During this process, Craig never smelled the odor of propane, although he had his nose "right in it." He heard a hissing noise, but did not think it was gas because he smelled no odor of gas—"[o]therwise I would have never struck a match." Craig had the in-line "on/off" valve in the "off" position and was going to attempt to turn that valve slightly into the "on" position and see if gas was coming through by striking a match at the tip of the gas line. When he did strike a match, the flash fire occurred.

[¶ 10] Craig was seriously burned in the flash fire. He was taken to the hospital in Powell and later flown to a hospital burn unit in Salt Lake City, where he remained in treatment for three weeks. Kim accompanied her husband to Salt Lake City, and

---

**4.** We take note at this juncture that reviewing the record in this case was quite difficult. Much of the important factual background was in depositions and no party included the entirety of the depositions in its papers. GWE and Big Horn included excerpts of the depositions of Craig and Kim Abraham, but only those portions that were favorable to their view of the facts. Moreover, the depositions were in the compressed format and the excerpts began and left off without regard to context, i.e., it was difficult to ascertain the purport of the excerpts because of under inclusion. Excerpts included in the Abrahams' papers filled in some of these gaps, but those excerpts were also in the compressed format.

**5.** Both GWE and Big Horn contend that offers were made to light the pilots and Kim Abraham refused them.

relatives cared for the children in their absence. Kim did not know in what condition the house was, so she had family members, the landlord, and a plumber who lived nearby, check the house to make sure everything was all right. In that process all gas lines were reconnected and pilot flames were lit so that the gas system was in operating order. While the Abrahams were in Salt Lake City, anonymous donor(s) put 800 gallons of propane in the Abrahams' propane tank. That supply of gas lasted until December of 2000. At that time, the Abrahams again ran out of gas and when the propane tank was refilled, that supplier (neither GWE or Big Horn was involved) required a system check before refilling the propane tank because of the "out of gas" condition. When that delivery was made, a regulator on the Abrahams' propane tank was replaced with a new model of regulator. The old regulator was left on the propane tank but was eventually discarded by the Abrahams' landlord.

[¶ 11] The Abrahams offered an affidavit from an expert witness, Robert C. Stubbs (a consulting analytic chemist), in support of their opposition to the motions for summary judgment. In pertinent part it related:

2. One of the dangers of a propane tank running out of gas is that air can enter the line and tank unless the valves are turned off. After reviewing the facts of this case it is my understanding that the valves were not turned off.

3. After [GWE] delivered 50 gallons of gas on Friday July 28, 2000, Mr. Abraham unsuccessfully attempted to light the pilot the next morning. This inability to light the pilot was caused by air that had entered the line and tank.

4. Mr. Abraham never smelled gas while bleeding the line in attempting to light the pilot the morning of July 29, 2000. The reason he never smelled gas was because air had gotten into the line.

5. It is a well established fact that when air gets into a line it can cause oxidation, which oxidation interacts with the chemical added to the gas, ethyl mercaptan, which gives it its distinctive odor. This chemical is added deliberately to act as a warning of the presence of the gas.

Unfortunately, the odorant can be lost or diminished by a variety of methods, including oxidation.

6. Even if odorized propane gas is added to a tank, propane gas may flow for a period of time while its odorant is being absorbed into either the piping or the tank before odorized gas is finally released. This "lag" period in releasing odorized gas is caused by oxidation, which, in turn is caused by air entering the system.

7. Air may enter the system due to "tank breathing." Tank breathing is caused when the pressure inside the tank rises or falls due to temperature fluctuations in the atmosphere. The changes in the tank temperature and pressure may result in air being drawn into the system due to a temporary pressure vacuum. This often occurs in out-of-gas situations.

8. The propane industry has known for many years preceding the explosion in this case that an out-of-gas situation is extremely dangerous, in part because air can infiltrate the lines, cause oxidation, and rob the propane of its warning odorant.

9. Every year, thousands of people are injured or killed in propane related accidents.

10. The majority of people do not understand that they can be standing in propane and not smell it if its odorant chemical has been compromised. This is what happened in this case. The reason Mr. Abraham did not smell gas was because the odorant had been neutralized by the oxidation due to air getting into the system from an open line.

11. Both gas companies violated industry standards in their response to Kim Abraham's calls for gas, and but for these violations, Mr. Abraham would not have been subject to the explosion. I understand that my expert report will be due by August 15, 2003, if I am called upon to submit one, and I will provide my opinions on what specific breaches and violations were committed, and the bases for my opinions in that report.

12. Mr. Mahre has stated in his affidavit [6] that the removal of the regulator and the reconnection of the gas line to the water heater and lighting of the water heater precludes him from testing the system in its post-explosion condition.

13. However, Big Horn Co-op should have inspected and tested the system when it arrived at the Abraham's residence in accordance with industry standards. Had Big Horn Co-op done so before the explosion, they would have been able to do all the testing they now complain they cannot do and Mr. Abraham would not have been involved in the explosion.

14. There is no evidence that any system leakage existed anywhere in the system. I am aware of no evidence that there has been a leak in the system found either before of after the explosion. The only reasonable cause of the accident is described by Mr. Abraham attempting to bleed the line, with gas robbed of its odorant by oxidation entering the basement, which exploded when he struck a match.

15. One would have expected if there was a leak in the system, Mr. Abraham would have ignited it when he first attempted to light the pilot light. If there had been a leak, one would expect that after the explosion either another explosion would have occurred, or some evidence would exist of repairs or other incidences, none of which I am aware.

16. Taking a sample of the storage tank before additional propane was introduced would only demonstrate whether the gas put into the tank was properly odorized, but would not have demonstrated whether the gas flowing from the line during Mr. Abraham's bleeding the line retained the odorant, after air had infiltrated the system. Even assuming the gas that was put into the tank by Big Horn Co-op was fully and properly odorized, does not mean that the same gas after air infiltrated the line retained the necessary smell to alert one to its presence.

17. Regarding the regulator, no evidence exists that it would have played any role in this incident. As evidenced by the [V–1] Propane invoice dated January 18, 2001, the regulator was eventually removed not because it was malfunctioning, but rather because it was "outdated." Regulators are customarily replaced once they have reached a certain age, regardless of the working condition. Even if the regulator had malfunctioned it would not have resulted in an explosion of this nature. To suggest that this regulator had any importance to the cause and origin investigation of this explosion is unsustainable.

18. I strongly disagree that Mr. Mahre's independent forensic work is or has been impaired by any of the assertions he has set forth in his affidavit.

### STANDARD OF REVIEW

▆▆▆ [¶ 12] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. If the evidence leads to conflicting interpretations or if reasonable minds might differ, summary judgment is improper. That

---

6. William A. Mahre served as an expert witness for Big Horn and submitted an affidavit, which, in essence, stated that because of spoliation of the evidence at the scene of the flash fire, it was impossible for Big Horn to defend this action by the Abrahams and, conversely, it was impossible for the Abrahams to prove their case. It is Big Horn's contention, and that of GWE as well, that because the system was hooked back up before an investigation took place, and because 800 gallons of propane were added to the Abrahams' propane tank, and because the old regulator on the tank was discarded, it is impossible for anyone to establish what caused the flash fire.

standard of review is refined somewhat when applied to a negligence action. Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. *Woodard v. Cook Ford Sales, Inc.*, 927 P.2d 1168, 1169 (Wyo.1996). We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact. *See Krier v. Safeway Stores 46, Inc.*, 943 P.2d 405 (Wyo.1997) (failure to establish duty); *Popejoy v. Steinle*, 820 P.2d 545 (Wyo.1991) (failure of proof of underlying claim of a joint venture); *MacKrell v. Bell H2S Safety*, 795 P.2d 776 (Wyo.1990) (failure of proof of defendant's duty); *DeWald v. State*, 719 P.2d 643 (Wyo.1986) (cause element was pure speculation); and *Fiedler v. Steger*, 713 P.2d 773 (Wyo.1986) (failure to establish cause in a medical malpractice action). *See McMackin v. Johnson County Healthcare Center*, 2003 WY 91, ¶¶ 8–9, 73 P.3d 1094, ¶¶ 8–9 (Wyo.2003).

[¶ 13]   There are several other matters we will discuss as we progress through the issues raised in this appeal. We will set forth the applicable standard of review as we discuss those other issues.

## DISCUSSION

### Standing

[¶ 14]   We embark upon our discussion by briefly addressing whether the Abrahams lack standing to prosecute this appeal because it is an asset of their bankruptcy estate. This issue was resolved when this Court issued an order granting the Abrahams' motion to substitute the trustee in bankruptcy for the Abrahams.

### Denial of Motion for Continuance

■   [¶ 15]   The Abrahams sought a continuance of the July 28, 2003 hearing on the motions for summary judgment.[7] The record bears out that the deadline for completing discovery was August 15, 2003, and the parties do not dispute that that date was established by the district court's scheduling order.[8]   In the motion for continuance, the Abrahams were very specific in asserting that they needed additional time to respond to the other side's expert opinion and to obtain the detailed report which the Abrahams' expert was in the process of preparing. In addition, the Abrahams informed the district court that they were still in the process of deposing key witnesses and had taken the deposition of GWE's delivery man the day of the hearing on the motion for summary judgment (relating to odorization, failure to inspect, and failure to warn). Several other very important witnesses, all employees of GWE or Big Horn, were scheduled to be deposed before the August 15 discovery deadline. All of these proposed discovery materials clearly had a bearing on whether there were genuine issues of material fact, and needed to be examined by the Abrahams' expert in order to rebut GWE's and Big Horn's assertions with respect to spoliation of evidence. However, the district court opined in its decision letter that spoliation of the evidence relating to the flash fire created a situation that made it impossible for further discovery to make any difference in this case. The district court's decision letter is brief and we set it out here:

> Plaintiffs' complaint asserts two grounds for liability: (1) [GWE and Big Horn] failed to provide adequately odorized propane gas so that [Craig Abraham] was not alerted to the presence of gas when he was attempting to light [the] pilot light and (2) [GWE and Big Horn] failed to perform inspections to ascertain whether the gas system was safe.
>
> These contentions cannot be proved by [the Abrahams] nor disproved by [GWE and Big Horn] because [the Abrahams] did not preserve the essential evidence for inspection by either side. The allegedly defective propane gas was altered by being mixed with new gas deliveries. The condition of the gas system was substantially changed so that it is impossible to deter-

---

7.   Although the motion was placed in the Abrahams' opposition to GWE's motion for summary judgment, it is clear in context that it applied to both motions for summary judgment.

8.   Neither the record nor questioning at oral arguments explains why the hearing on the motions for summary judgment was scheduled before the deadline for discovery.

mine if it was safe or unsafe at the time of the accident.

The evidence available shows that the propane was adequately odorized. There is testimony that an odor was detected at delivery.[9] Bills of lading show that the gas was odorized.

. . . .

The evidence also demonstrates that there were no leaks in the gas system. After the first delivery of gas, a number of matches were lit without producing any fire. The explosion occurred only after Mr. Abraham disconnected the lines and struck a match.

Plaintiffs' expert witness surmises that air was introduced into the gas line, that this neutralized the odor, and that Mr. Abraham was then unable to detect the presence of gas. The problem is that no expert will ever be able to inspect the gas system as it existed at the time of the explosion. Thus, there is no way to determine if air had invaded the lines. Testimony to the contrary is only speculation.

Consequently, [the Abrahams'] motion for continuance is denied. In the absence of the physical evidence, expert witnesses can only speculate about what might have happened. There are no inspections or experiments that can be conducted because the evidence no longer exists.

As our further discussion will bear out, the district court misapprehended the spoliation of evidence rules and engaged in fact finding with respect to genuine issues of material fact that were in dispute. Those factual issues must be resolved by a jury.

■■■■ [¶ 16] The trial court has broad discretion in granting or denying a motion for continuance, and absent a manifest abuse of discretion, the reviewing court will not disturb such ruling. To find an abuse of discretion, the refusal must be so arbitrary as to deny appellant due process, and the burden rests upon appellant to prove actual prejudice and a violation of his rights. Upon review we look at the peculiar circumstances of the case and the reasons presented to the trial judge at the time of the request. *Byrd v. Mahaffey*, 2003 WY 137, ¶ 7, 78 P.3d 671, ¶ 7 (Wyo.2003).

[¶ 17] W.R.C.P. 56(c) and (f) provide:

(c) *Motion and proceedings thereon.*— Unless the court otherwise orders, the motion and any response and other papers relating thereto shall be served pursuant to Rule 6(c). The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

. . . .

(f) *When affidavits are unavailable.*— Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

[¶ 18] W.R.C.P. 6(c)(1) provides:

(c) *Motions and motion practice.*

(1) **Unless these rules or an order of the court establish time limitations other than those contained herein, all motions,** except (A) motions for enlargement of time, (B) motions made during hearing or trial, (C) motions which may be heard ex parte, and (D) motions described in subdivisions (3) and (4) below, **together with supporting affidavits, if any, shall be served at least 10 days before the hearing on the motion.** Except as otherwise provided in Rule 59(c), or unless the court by order permits service at some other time, **a party affected by the motion may serve a response, together with**

---

9. Kim Abraham said she smelled the odor of propane when GWE made its delivery, but did not remember whether she smelled it when Big Horn made its delivery.

affidavits, if any, at least three days prior to the hearing on the motion or within 20 days after service of the motion, whichever is earlier. Unless the court by order permits service at some other time, the moving party may serve a reply, if any, at least one day prior to the hearing on the motion or within 15 days after service of the response, whichever is earlier. Unless the court otherwise orders, any party may serve supplemental memoranda or rebuttal affidavits at least one day prior to the hearing on the motion. [Emphasis added.]

[¶ 19] The combination of these rules demonstrates that the district court abused its discretion in these circumstances. W.R.C.P. 56(c) presupposes that discovery is complete and, ordinarily, discovery on the issues which are the subject of the summary judgment motion should be allowed to be completed before a motion for summary judgment is scheduled, heard, and decided. By scheduling the hearing on the motions for summary judgment before the deadline for discovery had passed and, thus, not allowing the Abrahams adequate time to prepare and file any other pertinent materials prior to that hearing, they were deprived of the protections to due process afforded by the applicable rules of civil procedure.

## Spoliation of Evidence

[¶ 20] The district court determined that spoliation of evidence, which the court attributed to the fault of the Abrahams, commanded that GWE's and Big Horn's motions for summary judgment be granted. The jurisprudence associated with spoliation is more forgiving than that applied by the district court.

It is well settled that a party's bad-faith withholding, destruction, or alteration of a document or other physical evidence relevant to proof of an issue at trial gives rise to a presumption or inference that the evidence would have been unfavorable to the party responsible for its nonproduction, destruction, or alteration. "In essence, the inference is akin to an admission by conduct of the weakness of one's own case." This adverse inference has both an evidentiary and a punitive rationale. The evidentiary rationale derives from the common sense observation that a party who has notice that a document or other object is relevant to litigation and who proceeds to destroy it is more likely to have been threatened by it than is a party in the same position who does not destroy the document. Moreover, that the jury's attention will be called to the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. Indeed, scholars have argued that the inference should apply as well to an attorney's pretrial discovery misconduct.

Thus, for example, in a negligence action, where a party demonstrates that evidence was concealed or destroyed in bad faith (either deliberately or with reckless disregard for its relevance), that fact should be admitted, counsel should be permitted to argue the inference to the jury, the court should instruct the jury as to the inference, and the jury may infer that the fact would have helped prove negligence; a court's refusal may be an abuse of discretion. Indeed, some courts have held that such destruction creates a presumption that shifts the burden of production, or even persuasion, to the party responsible for the destruction.

Where the evidence, rather than being destroyed, has been tampered with in bad faith, a court also has the option of excluding it to deny the tampering party any use of it. Where the alteration is not in bad faith and the alteration is not so egregious, however, the evidence itself should be admitted, together with information relating to how it was altered, and counsel may argue the issue to the jury.

Where the loss or destruction of evidence is not intentional or reckless, by contrast, some courts give the trial court discretion to admit or exclude testimony relating to the missing evidence, and discretion to give or withhold a "missing evidence" instruction. And, a court should refuse to give such instruction if the non-produced evidence is cumulative or of marginal relevance.

2 Jones on Evidence Civil and Criminal, § 13:12 (1994 7th ed. and Supp.2000) (footnotes omitted).

[¶ 21]  An annotation of this subject provides this guidance:

> The cases collected in this annotation reveal that the effect of the loss or destruction of a product, or a critical component of a product, on the subsequent products liability claim depends on a number of varying circumstances.  In making its determination whether to sanction the spoliating party, the court will consider the following: (1) whether the innocent party was prejudiced by loss of the evidence; (2) whether this prejudice can be cured; (3) the practical importance of the lost evidence; (4) the fault of the spoliator; and (5) what is the least onerous sanction that will effectively deter the offending conduct.
>
> In a case in which the innocent party is in no way prejudiced by loss or destruction of the product, and circumstantial evidence of the claim is sufficient to make out a prima facie case, the court may choose not to impose any sanctions, ... nor will sanctions be imposed if the person or party benefited by the spoliation was not at fault in any way with regard to the loss of the evidence and did not act intentionally or in bad faith. . . . A court may also hold that a sanction is inappropriate in a case in which the plaintiff contends that a design defect, as opposed to a manufacturing defect, caused the injury.  In such a case, sufficient proof of the defect may be obtained from examining any one of the defendant's products, not merely the injury-causing product.
>
> In a case in which one or more of the factors under consideration warrants imposition of a sanction against the spoliating party, the court may choose to instruct the jury on the "spoliation inference," i.e., inform the jury that the lost evidence is to be presumed unfavorable to that party; preclude the spoliating party from introducing expert testimony concerning testing on the missing product or other evidence concerning the product; or dismiss the plaintiff's claim or the defendant's defense or grant summary judgment to the innocent party.

Richard E. Kaye, Annotation, *Effect of Spoliation of Evidence in Products Liability Action*, 102 A.L.R. 5th 99–100 (2002); *also see* Joseph Schneider and Edward M. Swartz, *Liquefied Petroleum (LP) Gas Fires and Explosions*, 14 Am.Jur. Trials 343, esp. §§ 6 (failure to test or inspect), 7 (failure to warn), 8 (failure to comply with safety standard or code), and 23 (odorization procedures) (1968 and Supp.2001); *Hay v. Peterson*, 6 Wyo. 419, 432–41, 45 P. 1073 (Wyo.1896).

[¶ 22]  Based on an overview of these authorities, we are compelled to conclude that the district court erred in its resolution of the spoliation issue, as well as its conclusion that the lack of evidence doomed both the Abrahams' case and GWE's and Big Horn's defenses.  The district court abused its discretion in granting the motion for summary judgment based on the theory of spoliation, given the facts and circumstances available to it.  Upon full development of this matter at trial, it may be that a sanction less than summary judgment or dismissal of the complaint is appropriate, or even no sanction at all.

**Granting the Motions for Summary Judgment**

[¶ 23]  We have carefully reviewed the record on appeal.  The evidence presented by the Abrahams structured one or more genuine issues of material fact that must be resolved by the fact finder.  *See, e.g., Van Hoose v. Blueflame Gas, Inc.*, 642 P.2d 36 (Colo.App.1982) (buyer of inherently dangerous product, propane, need not prove it was in a defective condition when it left hands of seller); *Tune v. Synergy Gas Corporation*, 883 S.W.2d 10, 14 (Mo.banc 1994) (failure to warn cases have two separate requirements of causation: (1) product for which there was no warning must cause injury complained of; (2) plaintiff must show that warning would have altered his behavior.  Where plaintiff testified he did know what propane smelled like, but did not know that odorant might not be effective under some circumstances, plaintiff made out prima facie case); *Crook v. Farmland Industries, Inc.*, 54 F.Supp.2d

947, 959–60 (D.Neb.1999) (where plaintiffs were intimately familiar with properties of propane, e.g., that it was heavier than air and could lose its odorant, failure to warn not proximate cause of injury, summary judgment appropriate); and *see generally Parkinson v. California Company,* 233 F.2d 432 (10th Cir.1956); Wade R. Habeeb, Annotation, *Duty and Liability in Connection with Odorization of Natural Gas,* 70 A.L.R.3d 1060 (1976 and Supp.2002). For this reason the order granting summary judgment must be reversed.

## CONCLUSION

[¶ 24] The district court abused its discretion in setting the hearing on the motions for summary judgment before the discovery deadline had expired and in denying the Abrahams' motion to continue that hearing to a time that was within the contemplation of the applicable rules of civil procedure. The district court erred in the manner in which it applied the doctrine of spoliation of evidence and, thus, the order granting the motions for summary judgment must be reversed. In addition, there are genuine issues of material fact at large in this case that render it inappropriate for resolution by summary judgment.