# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 96

### APRIL TERM, A.D. 2014

### July 30, 2014

WINDSOR ENERGY GROUP, L.L.C., an
Oklahoma Limited Liability Company,
and WINDSOR BEAVER CREEK
L.L.C., a Delaware Limited Liability
Company,

Appellants
(Plaintiffs),

v.

NOBLE ENERGY, INC., a Delaware
Corporation,

Appellee
(Defendant).

S-13-0214

NOBLE ENERGY, INC., a Delaware
Corporation,

Appellant
(Defendant),

v.

WINDSOR ENERGY GROUP, L.L.C., an
Oklahoma Limited Liability Company,
and WINDSOR BEAVER CREEK
L.L.C., a Delaware Limited Liability
Company,

Appellees
(Plaintiffs).

S-13-0215

*Appeal from the District Court of Sheridan County*
**The Honorable John G. Fenn, Judge**

*Representing Windsor Energy Group, L.L.C. and Windsor Beaver Creek L.L.C.:*
      Rocky Vroman and Nicholas T. Haderlie of Throne Law Office, PC, Cheyenne, Wyoming.  Argument by Mr. Vroman.

*Representing Noble Energy, Inc.:*
      Anthony J. Shaheen of Holland & Hart LLP, Denver, Colorado; Isaac N. Sutphin of Holland & Hart LLP, Cheyenne, Wyoming.  Argument by Mr. Shaheen.

*Before BURKE, C.J., and HILL, KITE\*, FOX, JJ., and WALDRIP, D.J.*

*\* Chief Justice at time of oral argument.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]    The predecessors in interest to Windsor Energy Group, LLC and Windsor Beaver Creek LLC (Windsor) and Noble Energy, Inc. (Noble) entered into a joint operating agreement (JOA) for Wyoming oil and gas interests in 2000.  In 2010, Windsor filed suit against Noble's predecessor claiming it was obligated for costs under the JOA even though it had assigned its interest to another party in 2004.  The district court granted summary judgment in favor of Windsor holding an assignor of an interest who was not formally released was still obligated under the JOA.  After a bench trial, however, the district court ruled that Windsor's claim against Noble for breach of the JOA was barred by laches.

[¶2]    We conclude, based on the unique circumstances of this case, the equitable doctrine of laches applies to Windsor's breach of contract claim and Noble proved the defense.  The rulings are conclusive; consequently, we affirm the district court's judgment without addressing the contract issue.

## ISSUES

[¶3]    The dispositive issues in these consolidated cases are:

1.    Did the district court err in ruling the equitable doctrine of laches was a defense to Windsor's claim for breach of an oil and gas contract even though the statute of limitations had not expired?

2.    Did the district court abuse its discretion by finding the elements of laches were satisfied in this case?

## FACTS

[¶4]    On June 30, 2000, J.M. Huber Corporation (Huber) and Suncor Energy (Natural Gas) America, Inc. (Suncor) entered into a JOA for development of oil and gas interests in the Beaver Creek Prospect in Sheridan County, Wyoming.  Huber was designated as the operator, and Suncor was the sole non-operator.[1]  The JOA generally allocated assets and liabilities in accordance with the proportionate interests of the parties.  It required the operator to notify the non-operator of lease development activities and obtain non-operator consent for certain expenditures through Authorizations for Expenditures (AFEs).  The operator was obligated to bill the non-operator for its share of the expenses on a monthly basis.  These bills were called Joint Interest Bills (JIBs).  The non-operator

---

[1] The district court found that Huber owned a 75% interest in the leaseholds and Suncor owned the remaining 25%.  There is, however, evidence in the record indicating that each party owned a 50% interest.  It is unnecessary to resolve this factual discrepancy to decide this case.

1

had the right to contest and/or audit the JIBs within two years. The JOA also specifically applied to successors and assigns.

[¶5]    On May 1, 2004, Suncor assigned its interest to Dolphin Energy Corporation (Dolphin). A few months later, on September 1, 2004, Huber assigned its interest to Windsor. Windsor began sending JIBs to Dolphin in January 2005. The JIBs included various lease expenses, including plugging and abandoning (P & A) expenses. Dolphin did not pay any JIBs and Windsor eventually filed suit in 2007. In 2008, Dolphin declared bankruptcy and never paid Windsor.

[¶6]    On December 4, 2009, Windsor sent a demand letter to Suncor asserting that it was obligated to pay the JIBs. Suncor did not pay, and Windsor filed a complaint in district court on March 22, 2010, alleging that, as assignor, Suncor remained liable for the costs because it had not been expressly released under the terms of the JOA or the assignment. Windsor initially sought breach of contract damages of over $625,000. The district court later allowed Windsor to amend its complaint to include on-going damages, bringing the total to more than $900,000.

[¶7]    Each party filed a motion for summary judgment. Windsor alleged that the relevant documents and case law established, as a matter of law, that Suncor was liable for the costs even though it had assigned its interest. Suncor asserted it was not liable for the expenses incurred after its assignment to Dolphin and, in any event, Windsor's claim should be barred by the defense of laches. The district court granted summary judgment in favor of Windsor, holding "Suncor remained liable to Windsor because it did not obtain a release from either Huber or Windsor, and the JOA did not contain a provision releasing Suncor from continued liability after the assignment." The court ruled, however, that genuine issues of material fact existed concerning the amount of damages and whether the doctrine of laches barred Windsor's claim.

[¶8]    Noble acquired Suncor's interest and was substituted as the defendant in this case. We will, however, follow the district court's example and continue to refer to the defendant as Suncor since the relevant documents use that name. The district court held a bench trial in June 2013 and ruled Windsor's claim was barred by laches. Windsor appealed the district court's laches ruling, and Suncor appealed the ruling that the assignor remained liable under the JOA unless expressly released. We consolidated the cases for argument and decision.

**STANDARD OF REVIEW**

[¶9]    In general, we apply the following standard when reviewing a district court's decision after a bench trial:

2

"The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

With regard to the trial court's findings of fact,

"we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law."

The district court's conclusions of law, however, are subject to our *de novo* standard of review.

*Morris v. CMS Oil & Gas Co.,* 2010 WY 37, ¶ 12, 227 P.3d 325, 330 (Wyo. 2010), quoting *Lieberman v. Mossbrook,* 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo. 2009) (citations omitted).

## DISCUSSION

### A. Does the Equitable Doctrine of Laches Apply to Breach of Contract Claims?

[¶10]  The district court ruled as a matter of law that the equitable doctrine of laches may bar an oil and gas breach of contract claim even though the statutory limitations period has not expired.  We review this conclusion of law *de novo*.

[¶11]  Windsor claimed that Suncor breached its contractual responsibilities under the JOA.  Actions on written contracts are governed by the ten year statute of limitations at Wyo. Stat. Ann. § 1-3-105(a)(i) (LexisNexis 2013).  There is no question in this case that the statute of limitations had not expired when Windsor commenced its action in 2010 for payment of the JIBs dating from 2005 to the date of trial.  Suncor asserted, however, that Windsor's claim was barred by laches.

3

[¶12] Laches bars a claim when a party has delayed in enforcing its rights to the disadvantage of another. *Dorsett v. Moore,* 2003 WY 7, ¶ 9, 61 P.3d 1221, 1224 (Wyo. 2003). "The defense of laches is based in equity and whether it applies in a given case depends upon the circumstances." *Ultra Resources, Inc. v. Hartman,* 2010 WY 36, ¶ 123, 226 P.3d 889, 929 (Wyo. 2010). Two elements must be proven to establish laches: 1) inexcusable delay; and 2) injury, prejudice, or disadvantage to the defendants or others. *Moncrief v. Sohio Petroleum Co.,* 775 P.2d 1021, 1025 (Wyo. 1989).

[¶13] Windsor asserts the district court erred by ruling the equitable principle of laches was available as a defense to a legal breach of contract claim. It argues that laches is completely inapplicable when a statute of limitations governs an action. The district court noted that other jurisdictions are split on whether the equitable doctrine of laches can be applied in an action at law for breach of contract. *See, e.g., Wyler Summit P'ship v. Turner Broadcast Syst.,* 235 F.3d 1184 (9th Cir. 2000) (laches is not a defense to a breach of contract claim); *Dep't of Banking & Finance of the State of Nebraska v. Wilken,* 352 N.W.2d 145 (Neb. 1984) (laches is available in a limited scope as a defense to an action at law based on contract); *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.* 715 S.W.2d 41, 46-47 (Tenn. 1986) ( laches barred claim for breach of contract to deliver waste oil). *See also* 30A C.J.S. *Equity* § 138 (2014).

[¶14] Relying on this Court's decision in *Moncrief, supra,* the district court decided laches was available as a defense in breach of contract actions involving oil and gas interests. Moncrief sought specific performance of Sohio Petroleum's contractual obligation to assign an oil and gas lease interest and for an accounting of the gas production from the lease. *Moncrief,* 775 P.2d at 1021-22. Sohio Petroleum asserted that Moncrief's claims were barred under both the statute of limitations and the equitable doctrine of laches. A majority of this Court ruled that application of the doctrine of laches was especially apt because the plaintiffs delayed in asserting their right to assignment until the lease became valuable. *Id.* at 1024-25. We noted "the doctrine of laches is particularly applicable to oil and gas and mining claims due to the nature of such property interests," which have extremely volatile values. *Id.* at 1025. Windsor maintains *Moncrief* does not justify application of laches in this case because it involved an equitable claim for specific performance of a contractual duty, not a legal claim for monetary damages based on breach of contract.

[¶15] In order to decide this issue, we need to review the development of the relevant jurisprudence in this state. In *Bliler v. Boswell,* 9 Wyo. 57, 59 P. 798, 805 (Wyo. 1900), we stated that laches was not a valid defense in a case involving a legal action to recover on promissory notes because the holder of the notes had not requested equitable relief. However, we also noted that it was "extremely doubtful" whether the elements of the laches defense were proven in that case. *Id.* Contrary to *Bliler's* seemingly broad statement that equitable defenses are not available in actions at law, in *Anderson v. Wyo.*

*Dev. Co.,* 60 Wyo. 417, 154 P.2d 318, 345-46 (Wyo. 1944), we ruled the plaintiffs' breach of contract claim was barred by laches as well as the statute of limitations. We quoted with approval the United States Supreme Court decision in *Halstead v. Grinnan,* 152 U.S. 413, 14 S. Ct. 641, 38 L. Ed. 495 (1894),

> "The defense [of laches] itself is one which, wisely administered, is of great public utility, in that it prevents the breaking up of relations and situations long acquiesced in, and thus induces confidence in the stability of what is, and a willingness to improve property in possession; and at the same time it certainly works in furtherance of justice, for so strong is the desire of every man to have the full enjoyment of all that is his, when a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge, and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known, it would be found his alleged rights either never existed, or had long since ceased. \*\*\* **The length of time during which the party neglects the assertion of his rights which must pass in order to show laches varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule.** It is an equitable defense, controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them."

*Anderson,* 154 P.2d at 346 (emphasis added).

[¶16] *Eblen v. Eblen,* 68 Wyo. 353, 234 P.2d 434 (Wyo. 1951) involved an action to establish a joint venture in an oil and gas lease. We concluded that both the statute of limitation and the doctrine of laches could be used as defenses in proper cases.

> It is well known that it is in the interest of society that claims against the individuals thereof should be promptly prosecuted. Accordingly in law statutes of limitation have been set up arbitrary in their operation. In equity we have the doctrine of laches which is not inflexible but founded on what may be regarded as making for a just result. . . .
>
> In *Abraham v. Ordway*, 158 U.S. 416, 15 S.Ct. 894, 895, 39 L.Ed. 1036, Mr. Justice Harlan speaking for the court said:

5

'Whether equity will interfere in cases of this character must depend upon the special circumstances of each case. Sometimes the courts act in obedience to statutes of limitations; sometimes in analogy to them. But it is now well settled that, independently of any limitation prescribed for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked.'

*Id.* at 377-78.

[¶17] In *Glenrock v. Abadie,* 71 Wyo. 414, 259 P.2d 766 (Wyo. 1953), this Court considered the reverse of the issue presented in the present case—whether the statute of limitations applied to an equitable action to reform a deed. This Court stated that, given the distinction between courts of equity and courts of law had been extinguished in Wyoming, statutes of limitation applied to all actions, whether legal or equitable in nature. *Id.* at 770.

[¶18] Our Rules of Civil Procedure blend equitable and legal actions together as a single type of action, a "civil action." W.R.C.P. 1 and 2. As we recognized in *Platt v. Platt,* 2011 WY 155, ¶ 18, 264 P.3d 804, 809 (Wyo. 2011), the rules of equity have generally continued to supplement statutory procedures, including statutes of limitation. For example, equitable estoppel may preclude a defendant from relying on an expired limitation period. *See, e.g., Lucky Gate Ranch, LLC v. Baker & Assoc., Inc.,* 2009 WY 69, ¶¶ 24-25, 208 P.3d 57, 66 (Wyo. 2009); *Swinney v. Jones,* 2008 WY 150, 199 P.3d 512 (Wyo. 2008). In addition, some equitable remedies, such as reformation, are available in contract actions, while others, such as unjust enrichment, are not. *See, e.g., Whitney Holding Corp. v. Terry,* 2012 WY 21, 270 P.3d 662 (Wyo. 2012) (reformation); *Schlinger v. McGhee,* 2012 WY 7, 268 P.3d 264 (Wyo. 2012) (unjust enrichment). These holdings are consistent because both reformation and contract damages (in lieu of unjust enrichment damages) are remedies which are consistent with enforcing the parties' contractual intent.

[¶19] In *Eblen,* 234 P.2d at 442-43, we explained that laches considers the conduct of the parties while statutes of limitation enforce arbitrary time limits without regard to the parties' relative positions. Some of the grounds for application of laches were discussed in *Eblen*:

'Several conditions may combine to render a claim or demand stale in equity. If by the laches and delay of the complainant it has become doubtful whether adverse parties can command the evidence necessary to a fair presentation of the case on

6

their part, or if it appears that they have been deprived of any such advantages they might have had if the claim had been seasonally insisted upon, or before it became antiquated, or if they be subjected to any hardship that might have been avoided by reasonably prompt proceedings, a court of equity will not interfere to give relief, but will remain passive; and this although the full time may not have elapsed which would be required to bar a remedy at law. * * *"

*Id.* (citations omitted).

[¶20]  Windsor argues that the purpose of applying laches in oil and gas cases, i.e., the volatility of values of mineral interests, does not apply here because unlike the plaintiff in *Moncrief*, it is not seeking to recover an oil and gas interest after the value has dramatically increased.  This distinction ignores the underlying rationale applied in *Moncrief*, i.e., one party may not act, or fail to act, to the disadvantage of the other especially regarding an asset with fluctuating values.  The value of the interest in the present case greatly decreased and the expenses greatly increased while Windsor failed to notify Suncor that it was responsible for the costs or to keep it informed about the activity on the leases.  Windsor wants to collect a large portion of those expenses from Suncor without giving it any opportunity to monitor its actions as operator.  The volatility of the value of the asset and the increasing liabilities makes this case appropriate for application of the doctrine of laches, even though the value of the asset decreased rather than increased.

[¶21]  Windsor also asserts that *Hammond v. Hammond,* 14 P.3d 199 (Wyo. 2000), supports its position that laches cannot be used to deny a claim when the statute of limitations has not expired.  In *Hammond,* 14 P.3d at 200, the mother brought an action to collect unpaid child support many years after the biological father's support obligation ended because he relinquished his parental rights.  The biological father claimed he was prejudiced and the action should be barred by laches because some of the bank records of his payments had been destroyed.  We discussed the difference between legal and equitable actions and concluded that laches did not apply to the mother's claim for past due child support because it was a legal, not an equitable claim.  The decision was, however, careful to point out that child support payments are different than other debts because they become judgments as soon as they are due.  Therefore, the limitations period applicable to uncollected judgments applied.  In addition, we noted that child support has a unique position in the law as the right belongs to the child rather than the parent.  To hold that the custodial parent's delay was undue and laches barred an action to collect child support would undermine the purposes and policy behind child support obligations.  *Id.* at 200-03.  The special considerations pertaining to child support enforcement actions simply do not apply to an action on a contract between business parties that has not been reduced to judgment.

7

[¶22] The totality of our precedent convinces us that laches should be available in certain circumstances in actions at law, including breach of contract actions, governed by a statute of limitations. Windsor's argument that laches is inapplicable whenever a statute of limitations governs a claim would completely abolish the doctrine of laches because all actions in Wyoming are governed by a statute of limitations. Section 1-3-105; *Abadie,* 259 P.2d at 770-71. This would frustrate our goal of securing the "just, speedy, and inexpensive determination of every action." W.R.C.P. 1. However, we also agree with the Nebraska Supreme Court's statement in *Wilken,* 352 N.W.2d at 149, that the role of laches in breach of contract cases covered by an applicable statute of limitations should be very limited in scope. Our precedent covering more than a century has consistently recognized the difficulty of establishing a laches defense. *See, e.g., Ultra Resources,* ¶¶ 123-28, 226 P.3d at 929-30; *Goshen Irrigation Distr. v. Wyo. St. Bd of Control,* 926 P.2d 943, 949 (Wyo. 1996); *Squaw Mtn. Cattle Co. v. Bowen,* 804 P.2d 1292, 1297 (Wyo. 1991); *Murphy v. Stevens,* 645 P.2d 82 (Wyo. 1982); *Bliler,* 59 P. at 805. Still, in the proper case, the defense of laches should be available to remedy not only the delay but the prejudice suffered by the defendant as a result of the plaintiff's dilatory action. The district court properly ruled as a matter of law that laches was an available defense.

## B. Did the District Court Abuse its Discretion by Concluding that Laches Barred Windsor's Claim?

[¶23] The district court concluded that Suncor had established the elements of laches and Windsor's claim under the JOA was barred. As we stated in the standard of review section, above, a district court's factual findings after a bench trial are subject to the clearly erroneous standard of review. The district court has discretion in determining whether or not the laches defense applies to particular circumstances; therefore, we review its ultimate decision for abuse of discretion. *Moncrief,* 775 P.2d at 1025. *See also Jones v. Jones,* 858 P.2d 289, 291-92 (Wyo. 1993) (applying the clearly erroneous standard of review to the district court's factual findings and abuse of discretion standard of review to its ultimate decision).

[¶24] To succeed on its laches defense, Suncor was required to demonstrate that Windsor's delay in asserting its claim was inexcusable and Suncor suffered injury, prejudice, or disadvantage as a result. *Moncrief,* 775 P.2d at 1025. The district court concluded that Suncor had established both elements of laches. With regard to the delay element, the district court first noted that Suncor had already assigned its non-operating interest to Dolphin and Windsor knew that the wells were poor producers when it purchased the leases from Huber. The district court made the following factual findings:

> 68. The evidence at trial established several instances of undue delay on Windsor's part.

8

69. The evidence showed that Windsor was not diligent about seeking payment from Dolphin. Although Dolphin did not pay a single JIB after Windsor purchased the leases, Windsor waited almost two years before even sending Dolphin a demand letter. Windsor waited an additional three years before sending a demand letter to Suncor, and it did so only after Dolphin had declared bankruptcy.

70. When Suncor received the demand letter in December 2009, it had not had an interest in the Beaver Creek field for almost five years. During those five years, Suncor never received any indication that Dolphin was not paying its bills or that Windsor was going to hold Suncor accountable for its assignee's failure to pay the JIBs. This was true even though Windsor had a relationship with Suncor involving other wells during this time and easily could have informed Suncor that these JIBs were unpaid.

71. Windsor argued at trial that it was not required to notify Suncor of Dolphin's non-payment, because Suncor had a duty to monitor its assignee to ensure performance of the contract. However, Windsor cited no authority for this proposition, and the JOA certainly imposed no such obligation. Windsor was in a better position than Suncor to know whether the JIBs were being paid, and Windsor should have promptly informed Suncor of Dolphin's non-performance.

72. Windsor also delayed in producing the JIBs to Suncor. Even after Windsor sent Suncor the demand letter in 2009, it continued to send the JIBs to Dolphin until April 2013. Suncor did not even have an opportunity to review the JIBs until they were belatedly produced in December 2012.

73. The testimony at trial established that Windsor did not even ask its accounting department to prepare the JIBs for production until December 2012, even though Suncor asked for them to be produced in early 2011. Further, Windsor never produced the underlying documents.

74. Although Windsor's witness, Ms. O'Hasson, testified that it would have been "prohibitive" to send these

9

documents with the JIBs, Suncor's witness, Ms. Westerberg, testified that it was Huber's standard practice to send these documents with the JIBs so that Suncor could review the JIBs for errors. Ms. Westerberg also testified that without seeing the underlying documents, it is impossible to determine whether the costs were actually incurred, whether the costs were allocated properly, or if the costs were authorized under the proper AFE.

75. This Court finds that the five year delay in notifying Suncor of Dolphin's nonpayment, the seven year delay in sending the JIBs to Suncor, and the continued refusal to produce the underlying documents constitutes undue delay.

[¶25] Windsor has not established on appeal that the district court's factual findings were clearly erroneous. As we have noted in precedent, there is no set length of delay that will be considered undue or inexcusable; the circumstances of each case must be considered in making that determination. *Anderson,* 154 P.2d at 346; *Eblen,* 234 P.2d at 377-78. Windsor's delay in asserting its claim was significant considering the amount of expenses incurred in the Beaver Creek field and the non-operator's right to notice and participation under the JOA. Windsor's witnesses testified as to on-going lease expenses and the significant costs associated with plugging and abandoning the wells starting around 2008. On cross-examination, Windsor's operations manager testified the wells had never been productive but he could not explain why they were not plugged earlier or what finally prompted the decision to plug and abandon the wells.

[¶26] Windsor's delay in providing the JIBs to Suncor and its failure to ever provide the underlying documents to justify its expenses further evidences the undue nature of the delay.[2] Suncor's Manager of Contracts, Lands, and Administration testified in general about how she reviewed JIBs and the process of requesting additional information from an operator and contesting charged expenses under a JOA. She stated that, without the underlying documentation, there was no way to know whether the costs were: appropriate under the JOA; actually incurred on a particular well; properly allocated or authorized under an AFE. Windsor's witnesses could not explain why the company did not retain the underlying records in light of the delinquent payments and the possibility of litigation.

---

[2] Suncor requested the JIBs and all other documentation supporting Windsor's demand in its first request for discovery in 2011, but Windsor produced only the Annual JIB Statement which summarized the JIBs for each year. At trial, the district court asked why Suncor did not file a motion to compel production of the documents and counsel stated Windsor's attorney had represented the documentation could not be located. *See* W.R.C.P. 26(c) (2011) (indicating that movant has a duty to, in good faith, confer or attempt to confer "with other affected parties in an effort to resolve the dispute without court action" before filing a motion for a protective order in discovery). The JIBs were finally produced by Windsor in December 2012, but the underlying documentation was never produced and most of it was destroyed.

[¶27]  In addition, Suncor did not have any input on the expenses or field development options, such as plugging and abandoning the nonproductive wells sooner in order to save money or finding other ways to avoid operation and P & A costs.  Windsor failed to communicate with Suncor about its potential liability even though Dolphin had never paid a single JIB.  The trial evidence does not show any justification for Windsor's delay.  On these facts, the district court did not abuse its discretion when it concluded Windsor's delay in asserting its claim against Suncor was inexcusable or undue.

[¶28]  With regard to the second element of a laches defense -- prejudice-- the district court found:

> 76.    At trial, the evidence showed Suncor was prejudiced by Windsor's undue delay in several ways:
>
>    a.    Suncor was not able to examine the JIBs or the underlying documents to check for errors;
>    b.    Suncor was not allowed to participate in decisions regarding the operation of the wells, and was not allowed to explore options to avoid incurring P & A costs;
>    c.    Suncor could not take any action between 2005 and 2009 to protect its interests, such as negotiating a settlement with Windsor before litigation was filed;
>    d.    From 2005-2009 Suncor had staff in the United States who could have reviewed the JIBs to make sure costs were legitimate under the authorization for expenditures ("AFEs") Suncor or Dolphin signed, but Suncor currently has no staff in the United States, so there is no one to review the JIBs or question the invoices; and
>    e.    Windsor waited to sue Suncor until Dolphin was insolvent, and Suncor can no longer seek subrogation or indemnification from its assignee.
>
> 77.    In addition, the late production of the JIBs impacted Suncor's ability to prepare a defense, because other than the summary of the JIBs that was provided in discovery, Suncor had no information about the costs that formed the basis of Windsor's claim until the JIBs were produced in December 2012.
>
> 78.    Windsor argues that Suncor was not prejudiced by not receiving earlier notice of Dolphin's non-payment or

11

the actual JIBs, because Suncor had no rights under the JOA to receive or inspect the JIBs. After Suncor assigned its interest in the wells to Dolphin, Dolphin became the non-operating party to the JOA. As such, Windsor had a duty to send the JIBs to Dolphin, and it fully complied with this duty. Dolphin then had the right to review the JIBs, ask for clarification or correction if needed, and to audit the JIBs within two years if it chose to do so.

79. Windsor's argument seems to be somewhat incongruous. Windsor first argued that Suncor was not prejudiced because it could have asserted its right to audit Windsor's numbers. It then claimed that Suncor had no rights to inspect or challenge the JIBs because Suncor lost all rights it had under the JOA when it assigned its interest to Dolphin. When questioned by the Court about these seemingly contradictory statements, Windsor claimed that Suncor should have been monitoring its assignee and should have asked Dolphin to invoke its audit rights on Suncor's behalf.

80. The court does not find Windsor's argument persuasive. Even if Suncor should have asked Dolphin to demand an audit after it received the demand letter in 2009, because Windsor waited five years to make a demand on Suncor, there were already two years of JIBs Dolphin would not have been able to audit. [footnote]

[The footnote stated]: Windsor claims that this did not result in any prejudice to Suncor because Windsor was audited by an outside company during this time, and no errors were found in its accounting for the period of 2005-2008. However[,] the testimony also established that this audit was not a well audit done by a non-operator, and the audit was done when the underlying documents still existed. Because this information has subsequently been destroyed, the audit cannot be redone.

81. Due to Windsor's delay, Suncor was unable to obtain evidence it could have used in its defense, witnesses who were involved in the original transactions were no longer available, Suncor could no longer seek indemnification from its insolvent assignee, and Suncor was not able to take any action to avoid incurring these significant expenses.

[¶29] The evidence presented at trial supports the district court's findings. Windsor sought to hold Suncor responsible under the JOA even though it had already assigned its interest. Windsor did not, however, believe that the operator's duties of notification and obtaining consent under the JOA applied to Suncor because it was not the current non-operator. As such, it did not present AFEs or JIBs to Suncor or include it in any partner meetings or decision-making processes.

[¶30] To further confound the situation, Windsor did not retain most of the underlying documentation which would have at least allowed Suncor to confirm whether Dolphin received the AFEs and other notifications under the JOA. In addition, there were no invoices, receipts, etc. to justify the expenses shown on the JIBs or to show that the expenses were allocated properly. Windsor argued at trial that it was too late for the non-operator to audit or contest any of the expenses because the JOA imposed a two year deadline on contesting the operator's reported expenses. We note, as did the district court, that the two year review period was triggered when the operator sent the JIBs and Windsor did not send any JIBs to Suncor until after the right to audit on most of them had already expired. In addition, Windsor's argument begs the question of whether the expenses were properly justified and proportioned and clearly demonstrates the unfair position taken by Windsor—that the non-operator was bound by the JOA requirements but the operator was not. The district court aptly described the situation in its final conclusion regarding laches:

> 82. Fundamental fairness will not allow the Court to award Windsor the remedy that it seeks. "Equity aids the vigilant, not those who slumber on their rights." *Application of Beaver Dam Ditch Company.,* 93 P.2d 934, 939, 54 Wyo. 459, 482 (Wyo. 1939). The Court finds that because Windsor's undue delay in enforcing its rights prejudiced Suncor, laches should apply to bar Windsor's recovery.

[¶31] The district court's decision also touched briefly on the fact that Windsor's failure to retain most of the underlying documentation or to produce any that still existed also raised an issue regarding spoliation of evidence and affected its ability to prove damages. Many years ago in *Continental Sheep Co. v. Woodhouse,* 256 P.2d 97, 99-101 (Wyo. 1953), we discussed the implications of a party's failure to retain underlying documentation of a debt. Continental Sheep claimed it overpaid for hay provided by Woodhouse and presented evidence showing that it had paid for one hundred tons of hay it did not receive. Woodhouse kept records of the total amounts of hay delivered but the pages showing the individual deliveries to Continental Sheep were torn out of the accounting book. We stated it was "altogether probable" that the hay was delivered to someone else and Continental Sheep was charged by mistake. *Id.*

13

[¶32] With regard to the missing pages from Woodhouse's accounting book, this Court stated:

> These pages, which represented original entries, were not produced in the trial of this case, although the witness Jones looked for them. That witness admitted that it is not customary to tear out pages from a book which is a book of original entries. **And the fact of tearing out the pages from this book and losing them is a circumstance which throws considerable doubt on the fact that the evidence submitted by the defendant is correct.**

*Id.* at 100, citing 31 C.J.S., *Evidence*, § 153, p. 845 (emphasis added). *See also Farm Inv. Co. v. Wyoming College & Normal School,* 10 Wyo. 240, 68 P. 561 (Wyo. 1902) (holding party chargeable for face value of promissory notes because it failed to account for amounts collected); *Abraham v. Great Western Energy, LLC,* 2004 WY 145, ¶¶ 20-22, 101 P.3d 446, 455-56 (Wyo. 2004) (discussing presumptions that may be applied when a party withholds, destroys or alters evidence). Like in *Continental Sheep,* Windsor did not retain the underlying documentation to establish the legitimacy of the total expenses set forth in the JIBs.

[¶33] The district court noted, however, that the limited evidence presented at trial regarding the accuracy of the JIBs showed they were "reliable and reflect costs that were actually incurred." The district court also stated that "Windsor had an independent reason for ensuring the reasonableness of the costs and the accuracy of the billing; specifically, under the JOA, Windsor was responsible for paying 75% of the costs." Windsor asserts the district court's statements indicate the underlying documents were unnecessary to prove its expenses.

[¶34] The district court's observations are correct as far as they go. Nevertheless, as the district court noted later in its decision, the costs could not be overseen or tested by Suncor in the ways contemplated by the JOA and the matter of proper allocation could not be reviewed. There were possibilities of improper costs being attributed to the wells or proper costs being improperly allocated which, as in *Continental Sheep,* would require the underlying AFEs, invoices, receipts, etc. to confirm. Windsor's argument that the underlying documents were irrelevant would render meaningless the provisions in the JOA pertaining to the operator's duties to notify and obtain the non-operator's consent to certain costs. Consequently, in addition to affecting the prejudice component of laches, the lack of supporting documentation also adversely affected Windsor's ability to establish its damages in this case.

[¶35]   Our ruling that laches bars Windsor's claim against Suncor makes it unnecessary to address the district court's summary judgment decision that Suncor remained liable under the JOA even after it had assigned its interest to Dolphin.

[¶36]   Affirmed.