# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 58

APRIL TERM, A.D. 2022

May 6, 2022

TRAM TOWER TOWNHOUSE
ASSOCIATION,

Appellant
(Intervenor-Defendant and
Counter/Cross-Claimant),

v.

BERYL WEINER,

Appellee
(Plaintiff and Counterclaim Defendant),

and

LEONARD DVORSON; NEAL NORMAN
and MELISSA NORMAN, as Trustees of the
Norman Holdings Trust under agreement
dated July 12, 2005; ACONCAGUA
CAPITAL, LLC; CLIFF BRUDER; ANN
BRUDER; MARGARET ARMSTRONG;
JAMES A. KRENTLER, as Trustee of the
James Krentler Trust under agreement dated
April 8, 1987; FRANK PERNA, JR. a/k/a
FRANK PERNA; JOHN L. KEMMERER,
III; CONSTANCE KEMMERER; and
MICHAEL HEALY,

Appellees
(Defendants and Crossclaim Defendants).

LEONARD DVORSON; NEAL NORMAN
and MELISSA NORMAN, as Trustees of the

S-21-0142, S-21-0143

**Norman Holdings Trust under agreement dated July 12, 2005; CLIFF BRUDER and ANN BRUDER; FRANK PERNA, JR. a/k/a FRANK PERNA; and ACONCAGUA CAPITAL, LLC,**

**Appellants**
**(Defendants and Crossclaim Defendants),**

**v.**

**BERYL WEINER,**

**Appellee**
**(Plaintiff and Counterclaim Defendant),**

**and**

**TRAM TOWER TOWNHOUSE ASSOCIATION,**

**Appellee**
**(Intervenor-Defendant and Counter/Cross-Claimant),**

**and**

**MARGARET ARMSTRONG; JAMES A. KRENTLER, as Trustee of the James Krentler Trust under agreement dated April 8, 1987; JOHN L. KEMMERER, III; CONSTANCE KEMMERER; and MICHAEL HEALY,**

**Appellees**
**(Defendants and Crossclaim Defendants).**

*Appeal from the District Court of Teton County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Tram Tower Townhouse Association:*
Mark D. Sullivan of Mark D. Sullivan, PC, Wilson, Wyoming.

*Representing Margaret Armstrong, Michael Healy, John L. Kemmerer, III, Constance Kemmerer, and Beryl Weiner:*

    David Clark of Ragain & Clark, PC, Worland, Wyoming; Dale Cottam of Bailey Stock Harmon Cottam, Afton, Wyoming; Christopher Hawks of Hawks & Associates, LC, Jackson, Wyoming; Robert C. Jarosh of Hirst Applegate, LLP, Cheyenne, Wyoming.  Argument by Mr. Clark and Mr. Jarosh.

*Representing Leonard Dvorson, Neal and Melissa Norman, Aconcagua Capital, LLC, Cliff Bruder, Ann Bruder, and Frank Perna, Jr.:*

    Paul E. D'Amours of Hess D'Amours & Krieger, LLC, Jackson, Wyoming.

*Representing James A. Krentler:*

    No appearance.

*Before FOX, C.J., and DAVIS[*], KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*BOOMGAARDEN, J., delivers the opinion of the Court; GRAY, J., files a dissenting opinion in which DAVIS, J., joins.*

*[*]Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]     This is an ongoing dispute about who owns an undeveloped .53-acre parcel in Teton Village, Teton County, Wyoming, and whether it should be sold or conserved.  The conflicting ownership claims are the result of a series of unfortunate events, beginning with the faulty construction of townhouses in Teton Village, Wyoming; leading to the 1998 conveyance of adjoining land (the "Phase II Land") in settlement of claims against the developers; the formation of an LLC (the 1998 LLC), to hold the property; the administrative dissolution of the 1998 LLC; and the attempt to resurrect it with the formation of a new LLC (the 2006 LLC).  The many parties assert different ownership theories, depending on which entity they claim to derive their interest from.  The parties involved are many, and the procedural history is long, complex, and unfinished.  To date, the district court has issued several summary judgment orders and related rulings, which we affirm.

## ISSUES

[¶2]     The parties raise multiple issues in two appeals,[1] which we consolidated for briefing and argument.

[¶3]     The threshold issue common to both appeals is whether the receivership order pertaining to the 2006 LLC is an appealable order under W.R.A.P. 1.05(e)(2).

[¶4]     If it is, then the dispositive issues in the Association's appeal are:

> I. Should we convert the Association's appeal of the district court's summary judgment ruling that the 1998 conveyance was legal to a writ of review under W.R.A.P. 13.02?
>
> II. Did the district court err in ruling that the 1998 conveyance was legal?

[¶5]     And the dispositive issue in the Dvorson Appellants' appeal is:

---

[1]  In appeal S-21-0142, the Tram Tower Townhouse Association, a Wyoming nonprofit corporation, challenges the court's summary judgment decision that the 1998 conveyance of the Phase II Land from the developers to the 1998 LLC was legal.  It argues genuine issues of material fact require trial on the legality of the conveyance.  The Association also challenges a receivership order requiring winding up of the 2006 LLC and possible sale of the Phase II Land.

In appeal S-21-0143, the Dvorson Appellants challenge the same receivership order.  They argue the court abused its discretion by failing to order the receiver to maintain the 2006 LLC as a going concern until all appeals, not just this one, are complete.

1

Did the district court abuse its discretion by failing to order the receiver to maintain the 2006 LLC as a going concern until all appeals are complete?

## *FACTS*

### Background

[¶6]    In the early 1990s, Paul McCollister and Tram Tower Development Company (the Developers) finished a 12-unit residential development known as the Tram Tower Townhouse Project.  It soon became apparent the development suffered design and construction defects.  For example, the residential building roofs were designed and constructed in a manner that resulted in heavy ice formation and interior leaking; the common area roof also leaked.  The Association paid hundreds of thousands of dollars to fix these problems and then assessed those costs back to the townhouse owners.

[¶7]    In 1996, the Association retained the law firm of Ranck, Schwartz & Day, LLC to sue various individuals and entities, including the Developers.  Attorney William P. Schwartz, who handled the litigation, planned to name the Association as the plaintiff until he learned it might not have standing to bring certain claims.  To avoid this problem he named the individual townhouse owners as plaintiffs on the complaint.  Plaintiffs sought damages, as well as declaratory judgment that the Phase II Land could not be annexed into the Tram Tower Townhouse Project.

[¶8]    After filing the complaint, Schwartz discovered a potential conflict of interest among the townhouse owners, so he met with the Association's Board—which consisted of Perna, G. Moser, and Weiner—and its general counsel, Hank Phibbs,[2] to discuss the problem.  They decided the best solution would be for the individual townhouse owners to assign their claims against the Developers to the Association.  Schwartz sent the townhouse owners a letter explaining the conflict of interest and proposed solution, along with an Assignment and Conflict Waiver form.  The Association's President, Perna, followed up with a letter to the individual owners explaining that if they assigned their claims to the Association, they would receive a credit against further assessments for repairs and litigation.  Once all townhouse owners assigned their claims to the Association, Schwartz substituted the Association as the sole plaintiff in the lawsuit.

[¶9]    After the Association learned the Developers lacked insurance and had limited resources to satisfy any judgment, it sought to recover the Phase II Land as settlement.  Before mediation, the Phase II Land appraised at $550,000.

---

[2] Phibbs served as general counsel to the Association from the early 1990s until approximately 2010.

2

[¶10] Under the mediated settlement agreement, the Developers agreed to pay the Association $100,000 and convey the Phase II Land to the Association or its designee. Schwartz and Perna presented the settlement agreement to the Board for approval. With the Board's approval in hand, Schwartz then sent the townhouse owners a letter explaining the proposed settlement and further informing them that the Board intended to explore the possibility of donating the Phase II Land for a conservation easement.

[¶11] At the Board's direction, Schwartz consulted with Bill Hutton, a California attorney with expertise in conservation easements. Hutton advised that the Phase II Land should be conveyed to a Limited Liability Company, the members of which would be the Association members. That way, if the Phase II Land were donated for conservation, the individual LLC members could claim a charitable tax deduction. The Board unanimously agreed to create an LLC to take title to the Phase II Land and presented this to the Association members for consideration at their December 1998 annual meeting.

[¶12] On December 30, 1998, Perna signed a Mutual Release and Settlement Agreement (Settlement Agreement) with the Developers. The Settlement Agreement stated in relevant part:

> 1. Payment to Association. Within ten (10) days of the effective date of this Agreement, $100,000 shall be paid to the Association on behalf of [the Developers].
>
> 2. Conveyance to Association. On or before December 31, 1998, [the Developers] will execute and deliver to legal counsel for the Association an original Warranty Deed in the form attached hereto as Exhibit 1 (which deed has been prepared by the Association's legal counsel) conveying the Phase II property to the Association's designee, Gros Ventre, LLC, a Wyoming flexible limited liability company.

Schwartz organized Gros Ventre, LLC (the 1998 LLC), listing its members as the Association members. A Warranty Deed conveying the Phase II Land from the Developers to the 1998 LLC was executed and recorded on December 31, 1998.

[¶13] Following this conveyance, Schwartz approached several entities to explore whether they were interested in taking a conservation easement on the Phase II Land. None were.

[¶14] The 1998 LLC was administratively dissolved in 2001 for failure to file annual reports. By the time this was discovered in 2005, it was too late to reinstate the 1998 LLC. Believing dissolution of the 1998 LLC resulted in an automatic distribution of the Phase II Land to its members as tenants in common, Phibbs recommended those individuals

3

quitclaim their interests in the Phase II Land to a newly formed entity—Gros Ventre, LLC (the 2006 LLC). Most did.[3]

[¶15] A dispute about who owned the Phase II Land and whether to sell it arose in 2014, when Weiner and G. Moser received an offer to purchase the Phase II Land for $2,750,000. Perna, Weiner, and G. Moser, who had been managers of the 1998 LLC, engaged the law firm of Levy Coleman Brodie, LLP, to advise them on several issues, including who held legal title to the land. The law firm concluded that the 2001 administrative dissolution of the 1998 LLC did not result in a distribution of the Phase II Land to its members and, therefore, the 1998 LLC still held legal title to the land. It further concluded that the 1998 LLC was in a period of winding up and continued to exist for that purpose.

[¶16] On May 6, 2016, Weiner and G. Moser, purporting to act as managers of the 1998 LLC, conveyed the Phase II Land to the 1998 LLC members as tenants in common. The Warranty Deed stated they were doing so "in association with the completion of the dissolution, liquidation and winding up of the business affairs of [the 1998 LLC][.]"

[¶17] Approximately one week later, D. Moser submitted written notice of her resignation from the 2006 LLC and demanded her share of its assets. Weiner then sent Perna an email stating that he wished to dissolve the 2006 LLC.

### Initial Proceedings

[¶18] On May 20, D. Moser and Weiner filed a petition to partition the Phase II Land in accordance with Wyo. Stat. Ann. §§ 1-32-101 et seq. (Civil Action 17217). The petition alleged that the 1998 LLC continuously held sole legal title to the Phase II Land from December 1998 until May 2016, when the 1998 LLC managers, in order to wind up the company's business, conveyed it to the 1998 LLC's members, or their successors in interest, as tenants in common. They named the remaining 1998 LLC members, or their successors in interest, as defendants.

[¶19] In September, D. Moser and Weiner filed a separate petition (Civil Action 17311) after learning some defendants in Civil Action 17217 believed the 2006 LLC owned the Phase II Land. This petition alleged the 2006 LLC was dissolved on May 12, 2016, when D. Moser resigned and the remaining members did not unanimously agree to continue the business. The first cause of action was for judicial supervision of winding up of the dissolved 2006 LLC in accordance with Wyo. Stat. Ann. § 17-29-702(e)(i). The second

---

[3] The parties filed a stipulation about J. Kemmerer's ownership interest in the Phase II Land. It explained that J. Kemmerer "received his interest in the Phase II Land as a result of his ownership [] interest in the 1998 LLC." When he sold his townhouse to his sister, he did not convey his interest in the 1998 LLC or Phase II Land to her. Consequently, when she "granted a [quitclaim] deed in the Phase II Land[] to the 2006 LLC, she did not own an interest in the Phase II Land[]." And, because J. Kemmerer did not convey his interest in the Phase II Land to the 2006 LLC, he individually owned a 9.8 percent interest in the land.

4

cause of action was for partition of the Phase II Land in accordance with §§ 1-32-101 et seq., just in case the 2006 LLC owned it.

[¶20] Dvorson, the Brouses, the Bruders, and Perna (the Dvorson Defendants) answered the petition in Civil Action 17311. They generally denied the 2006 LLC was dissolved. But they admitted the 2006 LLC members could not agree who owned the Phase II Land or how any real estate it owned should be treated, nor were those issues likely to be resolved without court involvement. Among their affirmative defenses, the Dvorson Defendants asserted that D. Moser's voluntary withdrawal did not trigger dissolution of the 2006 LLC, the 1998 conveyance was void because it violated the Wyoming Nonprofit Corporation Act, and the 1998 Warranty Deed should be reformed to substitute the Association as grantee.

[¶21] The court consolidated the two actions because they involved common questions of law and fact about which LLC owned the Phase II Land and whether the land should be partitioned.

[¶22] The Association intervened, and filed an Answer, Affirmative Defenses, Counterclaims and Cross-Claims. In its first cause of action, the Association sought declaratory judgment that the 1998 conveyance was unlawful and void ab initio. It claimed the conveyance violated the Wyoming Nonprofit Corporation Act's prohibition against distributions because the 1998 LLC was made up of the same townhouse owners who were members of the Association. In its second cause of action, the Association sought an order quieting title to the Phase II Land in the Association, as well as an order canceling all deeds purporting to convey the Phase II Land to any party other than the Association.

[¶23] In October, D. Moser and Weiner amended their petition in Civil Action 17217 to add a cause of action for judicial supervision of winding up of the 1998 LLC. They thus sought alternative relief depending on who owned the Phase II Land. In the event they and the defendants owned the Phase II Land as tenants in common, they requested partition. But if the 1998 LLC owned the Phase II Land, they requested judicial supervision of the winding up of the 1998 LLC under Wyo. Stat. Ann. § 17-29-702(e)(i).

### Summary Judgment Rulings

[¶24] The parties filed a series of summary judgment motions over the next year.

### Legality of the 1998 Conveyance

[¶25] Weiner, D. Moser, Krentler, Armstrong, and Healy (the Weiner Movants) moved for summary judgment on the Association's claim that the 1998 conveyance was unlawful. They articulated alternative reasons why the Association's claim failed. First, they argued the 1998 conveyance could not have violated Wyo. Stat. Ann. § 17-19-1301, the statute

prohibiting nonprofits from making distributions, because the Association never held the Phase II Land as an asset. The unambiguous Warranty Deed conveyed the Phase II Land directly from the Developers to the 1998 LLC. Second, even if the court looked beyond the four corners of the Warranty Deed, the Settlement Agreement also made clear that the Phase II Land was to be transferred directly from the Developers to the 1998 LLC. Third, even if the conveyance was an unlawful distribution, Wyoming's statutes related to ultra vires transactions prohibited its undoing. In addition, laches, waiver, and the law related to unclean hands defeated the Association's claim.

[¶26] The Association simultaneously moved for summary judgment on its declaratory judgment claim. According to the Association, it acquired the Phase II Land from the Developers through the Settlement Agreement and then distributed the land "asset" to its members, in violation of Wyo. Stat. Ann. § 17-19-1301. The Association asked the court to consider the Settlement Agreement, affidavits, letters, and Board meeting notes to prove the Association was the actual party conveying the Phase II Land to the 1998 LLC, whose members were the same as the Association's. The Association requested the court declare the 1998 Settlement Agreement and Warranty Deed illegal and void ab initio, declare the Association the equitable owner of the Phase II Land, and quiet title in the Association.

[¶27] The court partially granted the Weiner Movant's motion and denied the Association's for the same reasons. It held, as a matter of law, that conveyance of the Phase II Land from the Developers to the 1998 LLC was legal. It reasoned that the 1998 Warranty Deed was unambiguous. The 1998 Warranty Deed conveyed the Phase II Land directly from the Developers to the 1998 LLC. The Association was not part of that transaction. Consequently, the conveyance was not illegal or contrary to Wyo. Stat. Ann. § 17-19-1301. The court thus dismissed the Association from the case.[4]

### Authority to Convey the Land in 2016

[¶28] The Brouses, Perna, Dvorson, and the Bruders moved for partial summary judgment that Weiner and G. Moser lacked authority to convey the Phase II Land to the 1998 LLC members when they purported to do so in 2016. The court granted their motion. It held, as a matter of law, that the 1998 LLC underwent a winding up period after its administrative dissolution in 2001. The winding up period was complete by the time former members of the 1998 LLC quitclaimed their interests in the Phase II Land to the 2006 LLC. Weiner and G. Moser therefore had no authority to distribute interests in the Phase II Land when they purported to do so in 2016.

---

[4] The court initially did not dismiss the Association from the case because it erroneously thought the Association had an adverse possession claim. But then the parties sought clarification whether the Association had any remaining claims and the Association conceded it did not. The court therefore dismissed the Association from the case.

6

### 2006 LLC Dissolution

[¶29]  On cross motions for summary judgment, the court held that the 2006 LLC was dissolved in May 2016, when D. Moser resigned and Weiner did not agree to continue the business of the LLC.  It also ordered judicial supervision of the winding up of the 2006 LLC.

### Appointment of a Receiver

[¶30]  The parties filed competing motions to appoint a receiver to manage or sell the 2006 LLC's remaining asset.  Healy, Armstrong, and Weiner moved to appoint attorney Charles Clinger under the receiver statutes—Wyo. Stat. Ann. §§ 1-33-101 et seq.  They wanted Mr. Clinger to take control of the Phase II land, oversee its sale, and manage and oversee the winding up of the 2006 LLC under the Wyoming Limited Liability Company Act—§ 17-29-702.  The Dvorson Defendants moved to appoint attorney Jon Wylie under § 17-29-702.  They wanted Mr. Wylie to preserve the 2006 LLC's activities and property as a going concern for a reasonable time until all appeals are complete, and then oversee any necessary winding up.

[¶31]  In its receivership order, the court noted that it had authority under § 17-29-702(e) to appoint a person to wind up the company's activities, and it had authority under § 1-33-101(a)(viii) to appoint a receiver in any case "where receivers have been appointed by courts of equity."  It proceeded to appoint Mr. Clinger to wind up the 2006 LLC, directing him to discharge its debts, obligations, or other liabilities, settle and close its activities, and marshal and distribute its assets, as required under § 17-29-702(b)(i).  The court instructed that if Mr. Clinger could do so without selling the Phase II Land, then he should wind up the LLC, terminate the LLC, and transfer appropriate shares of the Phase II Land to each of the interest holders, who would then own the land as co-tenants.  But if Mr. Clinger could not do so, then he must sell the Phase II Land to meet those obligations.

[¶32]  Finally, the court stated that it found unpersuasive the Dvorson Defendants' argument that the 2006 LLC must be maintained to preserve the Phase II Land during potential appeals.  It noted that if the parties appealed they could request a stay under § 1-17-210 and present a supersedeas bond under W.R.A.P. 4.02.

### Appeal, Dismissal, and Reinstatement

[¶33]  The parties appealed.  We initially dismissed their appeals, concluding the receivership order was not a final appealable order because it did not determine the action

or resolve all outstanding issues. The parties petitioned for reinstatement on grounds that the receivership order was appealable under W.R.A.P. 1.05(e)(2).

[¶34] We reinstated the appeals under W.R.A.P. 1.05(e)(2) but ordered the parties to brief two issues. First, we asked them to brief whether the district court appointed a "receiver" or simply appointed "a person to wind up the company's activities" under Wyo. Stat. Ann. § 17-29-702(e), explaining that the answer to that question may determine whether we have jurisdiction over the appeals. Second, we asked them to brief whether the summary judgment ruling the Association appeals is within the scope of an appeal from the receivership order.

### Stay

[¶35] The district court scheduled a bench trial for October 2021 on issues surrounding membership in the 2006 LLC and the intent of the 2006 LLC Operating Agreement for admission of members. After we reinstated the appeals, the district court, on its own motion, requested the parties brief whether it could or should proceed with trial. Without briefing that issue, the parties stipulated to proceed. The court rejected their stipulation, noting that the issues the Association raised on appeal were intertwined with the issues for trial, and our decision in the Association's appeal could undermine any progress made at trial. It therefore vacated trial and sua sponte stayed any sale of the Phase II Land during the pendency of the Association's appeal.

## *JURISDICTION*

### *The receivership order is an appealable order under W.R.A.P. 1.05(e)(2).*

[¶36] W.R.A.P. 1.05(e)(2) defines appealable orders to include interlocutory orders that "[a]ppoint receivers, or issue orders to wind up receiverships, or take steps to accomplish the purposes thereof, such as directing sales or other disposition of property." We have limited precedent applying this definition. *See Weiss v. Weiss*, 2008 WY 30, ¶ 13, 178 P.3d 1091, 1097 (Wyo. 2008) (stating that reliance on Rule 1.05(e)(2) was plausible but we did not need to refine our analysis of the proper basis for the appeal because the parties did not brief or argue those matters and, in any event, we were satisfied the order was appealable and as final an order as could be fashioned without causing diseconomies of effort).

[¶37] The parties agree we have jurisdiction to review the receivership order under W.R.A.P. 1.05(e)(2), but for slightly different reasons. According to the Association, the order is appealable because the court appointed a receiver and directed him "to take steps to accomplish the purpose of winding up such a receivership," including possible sale of the Phase II Land. According to the Weiner Appellees, the order is appealable because the court appointed a receiver under Wyo. Stat. Ann. § 1-33-101 and appointed him to wind

8

up the 2006 LLC's activities under § 17-29-702(e). According to the Dvorson Appellees, the court "appointed Mr. Clinger as a 'receiver,' whether under [] § 1-33-101 or § 17-29-702." We are satisfied the receivership order is appealable.

[¶38]  In its receivership order, the district court cited both its authority under § 17-29-702(e) to appoint a person to wind up the 2006 LLC and its authority under § 1-33-101(a)(viii) to appoint a receiver. *See* Wyo. Stat. Ann. §§ 17-29-702(e) (LexisNexis 2021) ("A court may order judicial supervision of the winding up of a dissolved limited liability company, including the appointment of a person to wind up the company's activities[.]"), 1-33-101(a)(viii) (LexisNexis 2021) ("A receiver may be appointed by the district court in the following actions or cases: . . . [i]n all other cases where receivers have been appointed by courts of equity[.]"). It then did both—appointing Mr. Clinger to wind up the 2006 LLC and act as receiver. After his appointment, Mr. Clinger signed an "Oath of Receiver," as required by § 1-33-103. *See* Wyo. Stat. Ann. § 1-33-103 (Lexis Nexis 2021) ("Before he enters upon his duties the receiver must be sworn to perform faithfully and give surety approved by the court, or by the clerk upon order of the court, in such sum as the court shall direct not to exceed double the amount of any property involved, conditioned that he will faithfully discharge the duties of receiver and obey the orders of the court."). Having thus appointed a receiver, the receivership order squarely falls within those orders defined as appealable under W.R.A.P. 1.05(e)(2) and we have jurisdiction over the appeals of the receivership order.

## DISCUSSION

### S-21-0142

**I.**     ***We convert the Association's appeal of the district court's summary judgment ruling that the 1998 conveyance was lawful to a writ of review under W.R.A.P. 13.02.***

[¶39]  In their briefing, the Association and the Weiner Appellees generally agree the court's summary judgment ruling is interlocutory. They then offer different reasons we should review it. At oral argument, the Association abandoned its pendent appellate jurisdiction argument and agreed with the Weiner Appellees that we should convert its appeal of the summary judgment ruling to a writ of review under W.R.A.P. 13.02. We exercise our discretion to do so.

[¶40]  W.R.A.P. 13.02 governs discretionary review of interlocutory orders:

> A writ of review may be granted by the reviewing court to review an interlocutory order of a trial court in a civil or criminal action, . . . which is not otherwise appealable under these rules, but which involves a controlling question of law as

9

to which there are substantial bases for difference of opinion and in which an immediate appeal from the order may materially advance resolution of the litigation.

We grant such review under limited circumstances: "when the case raises a question of law and appellate review of the district court's order would materially advance resolution of the litigation." *CIBC Nat'l Tr. Co. v. Dominick*, 2020 WY 56, ¶ 19, 462 P.3d 452, 460 (Wyo. 2020) (quoting *Snell v. Snell*, 2016 WY 49, ¶ 15, 374 P.3d 1236, 1240 (Wyo. 2016)).

[¶41]   This appeal "involves a controlling question of law as to which there are substantial bases for difference of opinion"—whether conveyance of the Phase II Land from the Developers to the 1998 LLC was legal and, relatedly, whether the Association's claim is barred.   Immediate appeal from the summary judgment ruling also "may materially advance resolution of the litigation."  If we affirm the ruling, the Association's claim will be resolved and it will remain dismissed from the case, focusing future proceedings on the remaining issues between the other parties.  If we reverse the ruling, future proceedings will focus on the legality of the 1998 conveyance, which could be dispositive and avoid an unnecessary—or, at the very least, premature—trial on membership interests in the 2006 LLC.

## II.     *Laches bars the Association's claim that the 1998 conveyance was unlawful.*

[¶42]   The Association argues genuine issues of material fact require trial on whether the 1998 conveyance was unlawful.   The Weiner Appellees defend the district court's summary judgment ruling that the conveyance was legal.   In the alternative, they argue the Association's claim is barred by other legal doctrines, including laches, waiver, and unclean hands.  The Association disputes application of each.

[¶43]   Under W.R.C.P. 56(a), a movant is entitled to summary judgment when he shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  We review the court's summary judgment ruling de novo.  *Gowdy v. Cook*, 2020 WY 3, ¶ 21, 455 P.3d 1201, 1206 (Wyo. 2020) (citations omitted).  We may affirm a summary judgment ruling on any basis found in the record.  *Hanft v. City of Laramie*, 2021 WY 52, ¶ 34, 485 P.3d 369, 381 (Wyo. 2021) (citing *Prancing Antelope I, LLC v. Saratoga Inn Overlook Homeowners Ass'n, Inc.*, 2021 WY 3, ¶ 41, 478 P.3d 1171, 1182 (Wyo. 2021)).  Because the undisputed facts of record establish, as a matter of law, that laches bars the Association's claim that the 1998 conveyance was unlawful, we affirm on that basis.[5]   *See Moncrief v. Sohio Petroleum Co.*, 775 P.2d 1021 (Wyo. 1989)

_____

[5] The Wyoming authority the dissent cites does not stand for the general principle asserted that neither a statute of limitations nor laches apply where a deed or judgment is void.  They instead stand for the principle that time limits do not exist where there is an underlying jurisdictional defect that leaves the court or taxing body without authority to act.  *Linch v. Linch*, 2015 WY 141, ¶¶ 14–16, 361 P.3d 308, 312–13 (Wyo. 2015) (explaining that W.R.C.P. 60(b) time limits do not apply to a Rule 60(b)(4) motion challenging a judgment

(affirming application of laches on summary judgment); *Hutchinson v. Pfeil*, 105 F.3d 562, 563–65 (10th Cir. 1997) (same); *J.D. Kirk, LLC v. Cimarex Energy Co.*, 604 F. App'x 718, 727–29 (10th Cir. 2015) (same); *Garner v. Yellow Freight Sys., Inc.*, 19 F. App'x 834 (10th Cir. 2001) (same).

[¶44] "Laches bars a claim when a party has delayed in enforcing its rights to the disadvantage of another." *Windsor Energy Grp., L.L.C. v. Noble Energy, Inc.*, 2014 WY 96, ¶ 12, 330 P.3d 285, 288 (Wyo. 2014) (citing *Dorsett v. Moore*, 2003 WY 7, ¶ 9, 61 P.3d 1221, 1224 (Wyo. 2003)). "The defense of laches is based in equity and whether it applies in a given case depends upon the circumstances." *Id.* ¶ 12, 330 P.3d at 288–89 (quoting *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, ¶ 123, 226 P.3d 889, 929 (Wyo. 2010)). "Two elements must be proven to establish laches: 1) inexcusable delay; and 2) injury, prejudice, or disadvantage to the defendants or others." *Id.* ¶ 12, 330 P.3d at 289 (citing *Moncrief*, 775 P.2d at 1025). "The existence of laches is primarily determined not by lapse of time but by considerations of justice." *Merrill v. Rocky Mountain Cattle Co.*, 181 P. 964, 974 (Wyo. 1919) (citation omitted).

#### Undue or Inexcusable Delay

[¶45] "[T]here is no set length of delay that will be considered undue or inexcusable; the circumstances of each case must be considered in making that determination." *Windsor*, ¶ 25, 330 P.3d at 292 (citations omitted); *see also Cathcart v. Meyer*, 2004 WY 49, ¶ 13, 88 P.3d 1050, 1058 (Wyo. 2004) ("Laches does not depend on the passage of time alone; the plaintiff must be chargeable with lack of diligence in failing to proceed more promptly." (citation omitted)). To determine whether the Association's delay was undue or inexcusable, we must identify the earliest time the Association could have brought its claim and then analyze whether the time that passed between then and when the Association first asserted its claim was unreasonable. *See* 30A C.J.S. Equity § 151, Westlaw (Mar. 2022 Update).

[¶46] The Weiner Appellees argue the Association's "inexcusable delay is manifest," as the Association "knew of and agreed to the 1998 LLC's acquisition of the Phase [II] Land when the conveyance occurred more than [22] years ago." They further assert the Association had multiple opportunities to bring its claim after that.

[¶47] The Association responds that its delay is excusable because Weiner and G. Moser were Association Board members for more than 20 years and, in their capacity as Board

---

as void and, thus, "the district court erred in denying Ms. Linch's motion challenging the divorce decree as void for lack of subject matter jurisdiction solely on the basis that the motion was not timely filed"); *Anadarko Land Corp. v. Fam. Tree Corp.*, 2017 WY 24, ¶¶ 46–47, 389 P.3d 1218, 1230–31 (Wyo. 2017) (holding, first, that a "[tax] deed is void—and therefore not subject to the statute of limitations—when the taxing entity lacked the authority or jurisdiction to issue it" and, second, that there was no such error in Laramie County's 1911 tax assessment). There is no such allegation or defect present in this case.

members and officers, discussed and approved the Settlement Agreement, consulted with Schwartz, approved transferring the Phase II Land to the 1998 LLC, and, for many years, supported conserving the land. The Association thus contends any inaction on its part is, at least in substantial part, due to Weiner and G. Moser's own inaction as Board members.

[¶48] It is undisputed the Association delayed asserting its declaratory claim for almost 20 years. The facts and law underlying its claim were known or should have been known to it in December 1998, when the Phase II Land was conveyed from the Developers to the 1998 LLC. Then, as now, the Association was a nonprofit corporation prohibited from making distributions. And, by design, the members of the Association and 1998 LLC were the same. The Association raised its claim seeking relief from its own action for the first time in March 2017, in response to this litigation.

[¶49] That delay is inexcusable under the circumstances. The Association was represented by legal counsel when the Developers conveyed the Phase II Land to the 1998 LLC. Schwartz represented the Association in the lawsuit against the Developers, and the Association had general counsel. Schwartz consulted with another attorney about conservation easements and how best to take title to the land. The advice of these attorneys suited the Association at the time. Now, confronted with possible sale and development of the Phase II Land, which has substantially increased in value, the Association relies on different legal advice to claim the 1998 conveyance was unlawful. But it cannot pick and choose between legal advice simply because the Phase II Land is now at risk of being sold. Nor is faulty legal advice a defense to laches. *See, e.g.*, 30A C.J.S. Equity § 174, Westlaw (Mar. 2022 Update) (citing *Mope v. Hazleton Area Sch. Dist.*, 96 Pa. Commw. 179, 506 A.2d 1345, 31 Ed. Law Rep. 878 (Pa. 1986)). Moreover, the Association cannot fall back on the makeup of the Board to excuse its delay now that some former Board members disagree with the Association and Perna on what to do with the Phase II Land. To adopt its reasoning would too easily allow a corporate entity to brush aside its decisions, avoid accountability, and circumvent laches at the expense of those who have been injured, prejudiced, or disadvantaged by its delay.

### Injury, Prejudice, or Disadvantage

[¶50] We have said "[t]he party asserting the doctrine of laches must show that he relied upon the plaintiff's actions and changed his position in reliance thereon to his prejudice." *Hammond v. Hammond*, 14 P.3d 199, 201 (Wyo. 2000). "Unless the delay has worked injury, prejudice or disadvantage to the defendants or others adversely interested, it is not of itself laches." *Id.* (quoting *Murphy v. Stevens*, 645 P.2d 82, 91 (Wyo. 1982)).

[¶51] The Weiner Appellees argue the "injury, prejudice, and disadvantage to others from [the Association's] delay is obvious." They assert Healy paid $50,000 to purchase his 2006 LLC interest, "and various others maintained their membership interests when they sold their townhomes." According to the Weiner Appellees, these interests will be worthless if

the Association is found to own the Phase II Land. They further assert that "newer [Association] members who purchased townhomes (but not LLC memberships)" will receive a windfall if the Association succeeds.

[¶52] The Association disputes whether Healy paid $50,000 for his membership interest in the 2006 LLC, insisting he paid nothing for it. It also disputes that Association members who are not also 2006 LLC members will receive a windfall, asserting that "[m]ost of the Weiner Appellees were owners and members from the beginning of the development" and know the Association acquired the Phase II Land and then transferred it to the 1998 LLC "with conservation and preservation in mind, not for individual members to reap a windfall by selling [it] to the highest bidder."

[¶53] Regardless of whether Healy paid for his 2006 LLC membership interest or whether newer Association members will receive a windfall, it is unjust for the Association to challenge the 1998 conveyance nearly 20 years later on grounds that were known or should have been known to it in 1998, when it was represented by legal counsel. There can be no dispute that numerous individuals have acted in reliance on the 1998 conveyance. Two LLCs have been formed around the Phase II Land. By Perna's own affidavit, the 2006 LLC engaged in various business activities related to the land, including adopting annual budgets, filing tax returns, paying casualty insurance, paying real property taxes, engaging legal counsel, and assessing members to raise funds to pay for such costs and expenses. Individuals with interests in the Phase II Land have also conveyed or retained their interest in the land as they saw fit over the years. Consequently, the members of the Association are no longer the same as the parties with an interest in the Phase II land.

[¶54] The Association's claim appears to be a last ditch effort to prevent the land from being sold or developed, something it could have achieved by taking title to the Phase II Land in 1998, continuing to work with legal counsel to achieve that end, or bringing its claim sooner. We also cannot help but observe that the conservation goal was not as altruistic as the Association suggests. A conservation easement would have permitted the Association/1998 LLC members to claim a charitable tax deduction and thus realize a tangible benefit from the settlement for construction and design defects to their townhouses. It should come as little surprise that when no conservation easement came to fruition and the value of the Phase II Land increased, some individuals became interested in selling it. Laches is particularly applicable where property values have significantly increased. *See Moncrief*, 775 P.2d at 1026.

[¶55] In sum, the Association made the bed in which it now lies and inexcusably delayed asserting its claim to the disadvantage of others. Laches therefore bars the Association from claiming that the 1998 conveyance was unlawful. Having no further interest in this litigation, the Association may not challenge the receivership order.

13

### *The district court did not abuse its discretion by failing to order the receiver to maintain the 2006 LLC as a going concern until all appeals are complete.*

[¶56]   We review the district court's receivership order for an abuse of discretion. *See Weisbrod v. Ely*, 767 P.2d 171, 174 (Wyo. 1989) ("Appointment of a receiver . . . is within the discretion of the trial court, controlled by the circumstances of each case." (citation omitted)).   Judicial discretion is "a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Id.* at 174–75 (quoting *Martin v. State*, 720 P.2d 894, 897 (Wyo. 1986)).   To establish an abuse of discretion, the Dvorson Appellants must demonstrate the "court could not have reasonably concluded as it did." *See, e.g.*, *Lund v. Lund*, 2022 WY 2, ¶ 44, 501 P.3d 1222, 1231 (Wyo. 2022) (citation omitted).

[¶57]   The Dvorson Appellants contend the court abused its discretion by failing to order the receiver to maintain the 2006 LLC as a going concern.   More specifically, they argue the court's decision is contrary to the "policy of 'preserving the status quo or the effectiveness of the judgment subsequently to be entered[.]'"   They note the 2006 LLC was administratively dissolved on March 10, 2020, and has until March 10, 2022, to file for reinstatement.   *See* Wyo. Stat. Ann. § 17-29-705 (LexisNexis 2021).   According to the Dvorson Appellants, if the 2006 LLC is not reinstated by then it probably cannot be reinstated or resurrected, and several rulings they have not yet had an opportunity to appeal will be moot, including the court's ruling that the 2006 LLC was dissolved in 2016 and the court's ruling that membership interests in the 2006 LLC are not appurtenant to ownership of each townhouse.

[¶58]   The Dvorson Appellants did not convince the district court it was necessary to maintain the 2006 LLC as a going concern and they have not convinced us the court abused its discretion.   Though the Dvorson Appellants suggest the only way to preserve the status quo is for the receiver to maintain the 2006 LLC as a going concern, they have not tried to maintain the status quo by other means.   Nor have they established why there are no other reasonable options available to them.

[¶59]   Now that the March 10, 2022 deadline for reinstatement has passed, some rulings about the 2006 LLC may be moot, but the 2006 LLC members who want the Phase II Land to remain undeveloped are not without recourse if the land must be sold.   The receivership order outlines steps the receiver must take to sell the Phase II Land.   The receiver must obtain input from the parties and interest holders before selecting an individual to appraise the land at its "highest and best use."   A full copy of the appraisal must be provided to each party and interest holder, who will then "have 20 days to notify the receiver of an intention to elect to take the Phase II Land for the appraised value."   "Multiple parties may deliver a

14

joint election." If only one individual or group elects to take the land then it must be sold to that individual or group for the appraised value. If more than one party and/or more than one group elects to purchase the land, then the receiver must auction the land to the interested parties and sell it to the highest bidder. Only if no party or interest holder elects to purchase the land may the receiver offer it for sale to the general public. The 2006 LLC members will thus have the first opportunity to purchase the Phase II Land if it must be sold.

## *CONCLUSION*

[¶60] In appeal S-21-0142, we conclude laches bars the Association's claim that the 1998 conveyance was unlawful. Because its claim is barred and it has no further interest in these proceedings, the Association may not challenge the later issued receivership order.

[¶61] In appeal S-21-0143, we conclude the district court did not abuse its discretion by failing to order the receiver to maintain the 2006 LLC as a going concern. We therefore affirm the receivership order.

**GRAY, Justice,** dissenting, in which **DAVIS, Justice,** joins.

[¶62] I dissent because I am troubled by the majority's application of the doctrine of laches. My concern is threefold, first, a void deed cannot acquire validity because of laches; second, laches is a question of fact, and in this case the conclusion that the association is guilty of laches is not one that should be first made on appeal; and finally, equitable considerations under laches do not support the majority's conclusion. Because laches should not apply, I would reach the question of whether the 1998 conveyance of the Phase II Land was lawful, and I would find there are issues of fact regarding the validity of the 1998 conveyance of the Phase II Land to the Gros Ventre, LLC (Gros Ventre). I would reverse and remand.

## A. Laches

[¶63] Laches is a form of equitable estoppel applied when a party unreasonably delays asserting a right. *See, e.g.*, *Goshen Irr. Dist. v. Wyoming State Bd. of Control*, 926 P.2d 943, 949 (Wyo. 1996). Laches typically applies as an affirmative defense that estops a party from asserting a right after causing an unreasonable delay. In other words, a party against whom laches applies must have failed to act diligently in asserting its right. Moreover, as recognized by the majority, laches is primarily determined by "considerations of justice." *Merrill v. Rocky Mountain Cattle Co.*, 26 Wyo. 219, 181 P. 964, 974 (1919) (quoting *Drees v. Waldron*, 212 F. 93 (8th Cir. 1914)); *see also Cathcart v. Meyer*, 2004 WY 49, ¶ 13, 88 P.3d 1050, 1058 (Wyo. 2004) (laches applies "when the delay has worked injustice, prejudice, or disadvantage to the defendant" (citing *Campbell Cnty. Sch. Dist. v. Catchpole*, 6 P.3d 1275, 1284 (Wyo. 2000))). Laches "cannot be invoked to defeat justice and will be applied as a defense only where the enforcement of the asserted right would work injustice." *Pelt v. Utah*, 611 F. Supp. 2d 1267, 1286 (D. Utah 2009) (quoting *Potash Co. of Am. v. Int'l Mins. & Chem. Corp.*, 213 F.2d 153, 154–55 (10th Cir. 1954)).

### 1. Laches Application to Void Deed

[¶64] Here, the Association sought declaratory judgment that the 1998 conveyance was unlawful and void ab initio under the Wyoming Nonprofit Corporation Act's prohibition against distributions to members. Gros Ventre's membership, by design, mirrored that of the Association. In other words, the townhouse members were the Gros Ventre members.

[¶65] In *Windsor Energy*, we held that under the right circumstances laches is available in actions at law. But we explained that the role of laches, in cases asserting legal, as opposed to equitable, rights, "should be very limited in scope." *Windsor Energy Grp., L.L.C. v. Noble Energy, Inc.*, 2014 WY 96, ¶ 22, 330 P.3d 285, 291 (Wyo. 2014) (citing *Dep't of Banking & Fin. of State of Neb. v. Wilken*, 352 N.W.2d 145, 149 (Neb. 1984)). Wyoming law does not generally permit a party to use laches to prevent the other party from asserting a legal right, such as enforcing an award in a divorce decree. *Meiners v.*

*Meiners*, 2019 WY 39, ¶ 19, 438 P.3d 1260, 1268–69 (Wyo. 2019) (citing *Hammond v. Hammond*, 14 P.3d 199, 202 (Wyo. 2000) ("defense of laches is not available in child support collection actions because suits for monetary judgments for child support arrearages are legal rather than equitable")).

[¶66]   We have likewise recognized that where a deed or judgment is void, neither a statute of limitations nor laches will apply.  *See Linch v. Linch*, 2015 WY 141, ¶ 14, 361 P.3d 308, 313 (Wyo. 2015) ("[T]here seems to be universal agreement that laches . . . cannot cure a void judgment[.]" (quoting *Jackson v. FIE Corp.*, 302 F.3d 515, 523 n.22 (5th Cir. 2002))). "[A] void deed is a nullity, making it ineffective to transfer title and ineffective to set a statute of limitations running."  *Anadarko Land Corp. v. Fam. Tree Corp.*, 2017 WY 24, ¶ 16, 389 P.3d 1218, 1223 (Wyo. 2017); *Denny v. Stevens*, 52 Wyo. 253, 73 P.2d 308, 310 (1937) (tax deed void on its face will not set statute of limitations in motion); *Poag v. Flories*, 317 S.W.3d 820, 825 (Tex. App. 2010) ("An equitable suit to quiet title is not subject to limitations if a deed is void."); *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 618 (Tex. 2007) (same, citing cases); *Argyle v. Slemaker*, 585 P.2d 954, 958 (Idaho 1978) ("Statutes of limitation are generally held to be inapplicable in actions brought by a landowner . . . to set aside a void deed[.]" (citing cases)).[6]

[¶67]   At issue here is the district court's decision that the conveyance was lawful, and the answer to that question is pivotal to whether or not laches is available.  The majority put the cart before the horse when it considered laches before determining the validity of the deed—if the deed was void ab initio, laches cannot apply.

### 2.  Laches Is a Question of Fact

[¶68]   The Weiner movants argued before the district court that laches barred the Association's claim that the transfer of the Phase II Land to Gros Ventre was void.  The district court declined to address this argument, instead in both its order granting partial summary judgment to Weiner and G. Moser and its order denying summary judgment to the Association, it held that the transfer was legal.  *See supra* ¶ 27.  While I agree with the majority that "[w]e may affirm a summary judgment ruling on any basis found in the record," *supra* ¶ 43, I do not think in this case we can properly uphold summary judgment relying on laches.

[¶69]   Typically, this Court has examined the question of laches where it was addressed by the lower court; our review is for an abuse of discretion.  *See, e.g.*, *Est. of Weeks by & through Rehm v. Weeks-Rohner*, 2018 WY 112, ¶ 38, 427 P.3d 729, 739 (Wyo. 2018); *Seherr-Thoss v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2014 WY 82, ¶ 60, 329 P.3d 936, 955 (Wyo. 2014); *Windsor Energy*, ¶ 23, 330 P.3d at 292; *Cathcart*, ¶ 13, 88 P.3d at 1058;

---

[6] I disagree with the majority's limited and deliberately narrow interpretation of the principles set forth in *Linch*, ¶ 14, 361 P.3d at 313 and *Anadarko*, ¶ 16, 389 P.3d at 1223.  *See supra* note 5.

*Dorsett v. Moore*, 2003 WY 7, ¶ 11, 61 P.3d 1221, 1224 (Wyo. 2003); *Thompson v. Bd. of Cnty. Comm'rs of the Cnty. of Sublette*, 2001 WY 108, ¶ 7, 34 P.3d 278, 280–81 (Wyo. 2001). We review a trial court's findings of fact to determine whether they are clearly erroneous. *Hall v. Hall*, 2005 WY 166, ¶ 6, 125 P.3d 284, 286 (Wyo. 2005).

[¶70] Because laches requires an intensive factual inquiry into the equities, its application is usually a question of fact. *See, e.g.*, *Weeks*, ¶¶ 38–41, 427 P.3d at 739–40; *Seherr-Thoss*, ¶ 61, 329 P.3d at 955; 30A C.J.S. *Equity* § 160, Westlaw (database updated Mar. 2022). Laches "may [only] be decided as a matter of law [when] the relevant facts are undisputed." 30A C.J.S. *Equity* § 160. "The conclusion that a plaintiff has been guilty of laches is not one that can be made by [an] appellate court, unless the subordinate facts found make such a conclusion inevitable as a matter of law." 30A C.J.S. *Equity* § 160; *see, e.g.*, *Reclaimant Corp. v. Deutsch*, 211 A.3d 976, 991 (Conn. 2019) (Connecticut Supreme Court declined to address the issue where "trial court made no factual findings regarding . . . laches"). The majority recognizes that there are disputed issues of fact in its discussion of undue or inexcusable delay and its discussion of injury, prejudice, or disadvantage. It then sweeps by those disputes in arriving at its conclusion that laches bars the Association's claim that the 1998 conveyance was unlawful.

[¶71] Here the district court did not find any "subordinate facts" that would decide the issue of laches, and it was inappropriate for the majority to do so without the benefit of the district court's analysis.

### 3. Laches Does Not Apply as a Matter of Law to the Facts in the Summary Judgment Record

[¶72] Even if it was appropriate to consider laches here, the equities do not favor its application. As part of the original Tram Tower Townhouse Project, a nonprofit corporation was set up to manage common areas and enforce rules—the Tram Tower Townhouse Association. All townhouse owners were members of the Association. Here, the party who is alleged to have failed to act diligently is the Association. However, in 1996 at the time the underlying complaint against the developer was filed and continuing through 2016, both Weiner and G. Moser, the parties seeking to benefit from the application of laches, wore many hats. They were townhouse owners and members of the Association, served as Association board members, and were members and managers of Gros Ventre.[7] They were also members of the 2006 LLC, which was formed after the discovery that Gros Ventre had been administratively dissolved.

[¶73] In 1998, during negotiations that led to the original settlement and the Phase II Land conveyance, the townhouse owners were advised that the Board intended to limit

---

[7] Under their management, Gros Ventre was administratively dissolved in 2001 for failure to file annual reports.

18

development of the Phase II Land through its donation for a conservation easement or other means. At their December 28, 1998 annual meeting, the Board informed the owners that to accomplish this, the Phase II Land should be conveyed to a limited liability company, the members of which would be the current owners and Association members. The owners participating at the meeting in person (including Weiner and G. Moser) and by proxy unanimously approved this course of action. Gros Ventre was formed.

[¶74] The prospect of a conservation easement on the Phase II Land did not come to fruition. The record is devoid of evidence evincing a change of purpose—that the Phase II Land would remain undeveloped—until 2014, when Weiner and G. Moser received an offer to purchase the Phase II Land for $2,750,000. The Association could not have known that the property ownership or intended use was disputed until that time.

[¶75] The majority properly recognizes the elements of laches: the party asserting the affirmative defense must prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *New Jersey v. New York*, 523 U.S. 767, 806, 118 S.Ct. 1726, 1748, 140 L.Ed.2d 993 (1998), *judgment entered*, 526 U.S. 589, 119 S.Ct. 1743, 143 L.Ed.2d 774 (1999) (quoting *State of Kansas v. State of Colorado*, 514 U.S. 673, 687, 115 S.Ct. 1733, 1742, 131 L.Ed.2d 759 (1995)); *see also Windsor Energy*, ¶ 12, 330 P.3d at 289.

[¶76] I question whether there was a lack of diligence by the Association. As explained in the preceding paragraphs, the Association had no indication that there were questions of ownership or purpose (land to remain undeveloped) with regard to the Phase II Land for many years. Accordingly, it had no reason to question or settle ownership of that property. The Association's intervention, shortly after Weiner and G. Moser filed to partition the Phase II Land, is not untimely in this case. There is no lack of diligence by the Association.

[¶77] Further, even assuming the Association lacked diligence in seeking to settle the title to the Phase II Land, such a lack was at least in part caused by Weiner and G. Moser, the parties seeking to invoke the doctrine of laches here. When "the party which advances the defense of laches is responsible for the delay or contributes substantially to it he cannot take advantage of it." *Pelt*, 611 F. Supp. 2d at 1286 (quoting *Potash*, 213 F.2d at 155). Unquestionably, the Association's failure to act emanates at least in part from its members' and Board's decisions and the Association members' votes. Thus, Weiner and G. Moser bear some of the responsibility for the Association's delayed action.

[¶78] Finally, I cannot conclude that there are no undisputed facts as to whether Weiner and G. Moser were prejudiced by any delay. Favorable inferences from the record may persuade the trial court that they were not. "[I]n the context of a defense based on laches, delay is not a bar unless it works to the disadvantage or prejudice of other parties. Where no one has been harmed in any legal sense and the situation has not materially changed, the delay is not fatal." 30A C.J.S. *Equity* § 153. "Prejudicial harm does not occur merely

because one loses what he or she otherwise would have kept. There must be a delay which causes a disadvantage in asserting and establishing a claimed right or defense, or other damage caused by detrimental reliance." *Id.* "Further, a party cannot assert the defense of laches if he or she actually benefited from the delay." *Markey v. Carney*, 705 N.W.2d 13, 23 (Iowa 2005) (citing 27A Am. Jur. 2d *Equity* § 193, at 670).

[¶79] The Association's intervention after the plaintiffs filed to partition the Phase II Land did not disadvantage Weiner or G. Moser in asserting a claimed right or defense.[8] Weiner and G. Moser have made no "showing of injury, change of position, loss of evidence, unavailability of witnesses, or some other disadvantage resulting from delay[.]" *See* 30A C.J.S. *Equity* § 153. Instead, they likely benefitted from the delay because the value of the Phase II Land undoubtedly increased during the relevant time frame.

[¶80] Here Weiner and G. Moser were members of the Association when the original plan to use the property for the common advantage of the Association and its members was devised, they were members of the Board, and then managers of the various LLCs. They voted on the plan intended to maintain the Phase II Land as open space and participated in the chosen mechanism to accomplish that end. Laches should not apply to their benefit now.

[¶81] Applying the doctrine of laches on this summary judgment record could undercut the purpose of the doctrine. Rather than preventing injustice and hardship, the majority's decision could instead create an injustice. *See Brost v. L.A.N.D., Inc.*, 680 P.2d 453, 456 (Wash. Ct. App. 1984). It could cause the divestiture of the Association's ability to assert its interest in the Phase II Land at least arguably at the hands of Weiner and G. Moser, whose votes and actions created Gros Ventre, and whose inaction and delays caused the need to establish the 2006 LLC and subsequent conveyances leading to the current situation. Equities, when weighed after development of the facts, could well prevent the application of laches here.

### B.    Validity of the 1998 Conveyance

[¶82] I now turn to the Association's claim that the 1998 conveyance was void ab initio. The facts show:

> [The Association's] Board wished to prevent development of
> the Phase II land. At some point in the settlement process the

---

[8] The majority asserts the 2006 LLC engaged in various business activities related to the land, including adopting annual budgets, filing tax returns, paying casualty insurance, paying real property taxes, engaging legal counsel, and assessing members to raise funds to pay for such costs and expenses. These are for the most part simply accoutrements of ownership and not changes in position. Moreover, the necessity to engage council and form the 2006 LLC resulted from the failures of the managers including Weiner and G. Moser to attend to the business of the LLCs they managed.

20

idea arose that, should [the Association] receive title to the Phase II land, a conservation easement might be placed upon the Phase II land [and . . .] might also provide the means through which the owners of units at the development who had financed the litigation could receive a charitable tax deduction. With this possibility in mind, the settlement agreement ultimately stated that the Phase II land would be conveyed to [the Association], "or its designee." The "designee" language was included because the Board concluded it might be advantageous to have the land be owned by an entity other than [the Association] because [the Association] was a non-profit corporation that could not take advantage of a possible charitable tax deduction available through the grant of a conservation easement. Thus, the settlement agreement left open exactly which entity would take title to the Phase II land.

[¶83]  The record reveals that the original settlement was between the Developer and the Association.  Gros Ventre was not a party to the settlement.  The material terms of the settlement, according to William Schwartz's (the Association's counsel) affidavit, were:

1. The Developer would convey the Phase II land to [the Association], or its designee;

2. The Developer would pay the sum of $100,000 to [the Association];

3. [The Association] would release the Developer from all claims;

4. [The Association] would dismiss the lawsuit.

[¶84]  On December 30, 1998, the Association and the Developers executed the settlement agreement, which, with respect to the Phase II Land provides:

> Conveyance To Association.  On or before December 31, 1998, [the Developers] will execute and deliver to legal counsel for the Association an original Warranty Deed . . . conveying the Phase II property to the Association's designee, Gros Ventre, LLC . . . .[9]

---

[9] The deed provides:
> TRAM TOWER DEVELOPMENT COMPANY, INC., a defunct Wyoming corporation, of Teton County, State of Wyoming, and PAUL

21

[¶85] After the Association Board ratified the settlement agreement, Mr. Schwartz recommended that the members of the Association form a new LLC, Gros Ventre, to take title to the Phase II Land. The Association approved that strategy. Its annual meeting minutes state:

> **Phase II Land Deal:**
>
> Phase II land was part of the settlement for the problems with the building. ***Not only did the Association receive the $100,000 but also received the Phase II [land] with the settlement.*** It was discussed not to take title of the land under the "Association[."] But rather accept land under a newly created non-profit LLC. . . .
>
> Motion was made to establish the LLC . . . .

(Second emphasis added.) As explained above, title to the Phase II Land passed from the Developer to Gros Ventre by the December 31, 1998 warranty deed.

[¶86] The parties do not dispute that the Association is a Wyoming nonprofit corporation, subject to the Wyoming Nonprofit Corporation Act, Wyo. Stat. Ann. §§ 17-19-101 through -1807 (the Act). The Act prohibits all "distributions" apart from those made upon dissolution.[10] The Act defines a "distribution" as "the payment of a dividend or any part of the income or profit of a corporation to its members, directors or officers[.]" Wyo. Stat. Ann. § 17-19-140(a)(xi) (LexisNexis 2021).

[¶87] Where a party is without legal authority to convey title to property, the conveyance is void. *See Jewish Cmty. Ass'n of Casper v. Cmty. First Nat'l Bank*, 6 P.3d 1264, 1267 (Wyo. 2000) (holding "where a settlor has no legal authority to convey legal title to property, putting said property into an irrevocable trust is *ultra vires* and the ostensible trust created thereby is consequently void *ab initio*"). If the conveyance of the Phase II

---

McCOLLISTER, a single man of Teton County, State of Wyoming, GRANTORS, for and in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, in hand paid, receipt of which is hereby acknowledged, CONVEY AND WARRANT to GROS VENTRE, LLC, a Wyoming flexible limited liability company of 20 East Simpson, P.O. Box 3890, Jackson, WY 83001, GRANTEE, the real estate described in Exhibit "A" hereto, [Phase II Land] together with all improvements and appurtenances located thereon or associated therewith, but subject to all easements and encumbrances of record.

[10] Wyo. Stat. Ann. § 17-19-1301 provides, "Except as authorized by W.S. 17-19-1302, a corporation shall not make any distributions." Wyo. Stat. Ann. § 17-19-1302(b) authorizes "distributions upon dissolution in conformity with article 14 of this act." Tram Tower has not been dissolved and thus no distributions have been made in conformity with Article 14 of the Act.

22

Land qualifies as a distribution from the Association to its members, then it was prohibited by the Act and is void.

[¶88]  *Borden v. Baldwin*, 281 A.2d 892, 894 (Pa. 1971) is instructive.  There, a nonprofit corporation attempted to avoid a statutory prohibition on distributions to members by transferring corporate property to a trust which would then distribute money held in trust to the corporation's members.  The *Borden* court ruled that such payments were improper distributions because the scheme was an attempt to effectuate an otherwise prohibited distribution of the nonprofit's assets to it members.  *Borden*, 281 A.2d at 895–96; *see also De La Trinidad v. Capitol Indem. Corp.*, 2009 WI 8, ¶ 37, 759 N.W.2d 586, 598 ("The defining characteristic of a nonprofit corporation is that it is barred from distributing profits, or net earnings, to . . . its directors, officers or members." (quoting Jane C. Schlicht, *Piercing the Nonprofit Corporate Veil*, 66 Marq. L. Rev. 134, 136 (1982))).

[¶89]  Here the district court refused to consider extrinsic evidence, instead determining that the deed was valid on its face.  But a facial defect in a deed is one ground, not the only ground, for finding a deed void.  *See, e.g.*, *Denny*, 73 P.2d at 310; *Anadarko*, ¶ 24, 389 P.3d at 1225 (citing *Thompson-Green v. Estate of Drobish*, 2006 WY 126, ¶ 12, 143 P.3d 897, 901 (Wyo. 2006) (failure of tax purchaser to make diligent effort to serve notice of redemption period on all co-tenants rendered tax deed void); *McCarthy v. Union Pac. Ry. Co.*, 58 Wyo. 308, 131 P.2d 326, 328 (1942) (declaring tax deed void where tax assessment was not made in name of property's true owner)).  There are questions of fact regarding whether the 1998 conveyance was a distribution prohibited by the Act.  The facts indicate that the Association, at a minimum, could have directed that the Phase II Land be conveyed to itself and that it did direct the conveyance to Gros Ventre.  If the Phase II Land was an asset of the Association and the conveyance qualifies as a distribution of its assets to its members, then it was prohibited by the Act and is void.  On the other hand, the Association may have been an intermediary to avoid a conflict of interest for counsel.  If so, the conveyance may have been a "pass through" of settlement proceeds making the homeowners whole for repairs.  In that case, the distribution of the Phase II Land may not have violated the statute.[11]  A trial is needed to make the determination.

---

[11] In determining the validity of the deed, the district court relied solely on the face of the deed.  Its reluctance to consider extrinsic evidence is not supported by Wyoming law.  In *Anadarko*, we explained:

> Essentially, Family Tree contends that since *Denny* holds that a facial defect in a tax deed will render that deed void, the corollary must also be true, that a tax deed can only be declared void if the alleged defect in the deed appears on the deed's face.  We find no support for this corollary rule in either the *Denny* decision itself or in our decisions subsequent to *Denny*.

*Anadarko*, ¶ 21, 389 P.3d at 1224–25.

Extrinsic evidence may be considered when considering whether a deed is void, on its face or otherwise.  *Id.* ¶ 24, 389 P.3d at 1225.

[¶90] I would conclude that there are factual questions regarding the transfer of the Phase II Land to Gros Ventre that require resolution. If the 1998 conveyance was a prohibited distribution, many of the remaining claims in this case become moot. I would reverse and remand for further development of the disputed facts.